A01A0395. HUDGINS v. AMERIMAX FABRICATED PRODUCTS, INC.
(551 SE2d 393)

PHIPPS, Judge.

Chris A. Hudgins filed a petition for declaratory judgment to ascertain the enforceability of a noncompetition, nonsolicitation agreement. Hudgins signed the agreement when he sold his stock as part of the sale of a family-owned business. After the trial court ruled adversely to Hudgins, finding that "[h]e must now abide by the covenants to which he agreed," Hudgins filed this appeal. Hudgins contends that the trial court used the wrong level of review and that under any standard, the restrictive covenants are unenforceable. Because we find that the territorial limitation is too broad we remand only for the trial court to determine the geographical area to which the restrictive covenants apply.

In 1999, Amerimax Fabricated Products, Inc. (Amerimax) decided to acquire Atlanta Metal Products, Inc. (Atlanta Metal), one

---

of its competitors. Atlanta Metal was a developer, manufacturer, and distributor of rain-carrying products, guttering, and downspouts and also sheet metal panels and roofing for residential and commercial use. From its inception, Atlanta Metal had been principally owned and operated by Hudgins's grandfather, two maternal uncles, and his mother. His grandfather, the founder of the company, had given nineteen shares of stock to Hudgins resulting in his having a two percent, nonvoting interest in the company. Hudgins began working at Atlanta Metal in 1975 and proceeded up the ranks from truck driver, machine operator, die setter, foreman, supervisor, and to plant manager for a time. In 1997, he became a purchasing agent and ceased managing employees.

When Amerimax purchased the outstanding stock certificates, all 18 shareholders in Atlanta Metal became bound by certain noncompete, nonsolicitation agreements. On June 3, 1999, in consideration for selling his stock interest and executing a document titled, "NONCOMPETITION AND NONSOLICITATION AGREEMENT IN CONNECTION WITH STOCK PURCHASE AGREEMENT," Amerimax paid Hudgins $680,200 for his 19 shares and for executing the covenants.[1] Before signing the documents, Hudgins had discussions with the majority stockholders, Charles Kidd, Wayne Kidd, and Mary Kidd Hudgins, and voiced his opposition to the sale, telling the others, "we were selling what I termed as the golden goose." As Hudgins explained, "the older stockholders in the company wanted to retire, and the younger ones did not want the debt that it would take to buy out the older ones."

When Hudgins executed the stock purchase agreement, he and all other shareholders were expressly required to sign noncompetition agreements. Section 5.2 (f) of the stock purchase agreement states:

> *Non-Competition Agreements*. Each Shareholder shall have executed and delivered to Purchaser a Non-Competition Agreement in favor of Purchaser, agreeing for a period of three (3) years following the Closing Date not to directly or indirectly engage in a business competitive with the Company within the geographic area referred to therein, in the form of *Exhibit 5.2(f)* attached hereto (the *"Non-Competition Agreements"*).

Hudgins admitted that he understood when he signed the agreement that he would be prohibited from directly or indirectly engaging in a

---

[1] While employed at Atlanta Metal, Hudgins's highest earnings in a single year were $130,000.

competitive business in the same geographic area for three years. Hudgins explained that he "didn't want to be a cog in the wheel" or to hold up negotiations or discourage Amerimax because his mother "wanted the deal to go through."

1. Hudgins contends that the trial court erred by applying the wrong level of scrutiny in reviewing the enforceability of the restrictive covenants. He claims that the noncompetition and nonsolicitation agreement at issue should have received "strict scrutiny" as an illegal and unconstitutional restraint of trade. He contends that the trial court erred in finding the agreement to be enforceable.

For purposes of judicial consideration, restrictive covenants that are ancillary to the sale of a business and restrictive covenants that are ancillary to employment contracts are analyzed in fundamentally different ways.[2] Part of the rationale for the distinction is attributable to the typically unequal bargaining power of employees who execute employment contracts, and part of the rationale reflects legitimate business concerns that arise in the sale of a business.[3] Consequently, a covenant entered into as part of the sale of a business can generally be drafted more broadly than one entered into as part of an employment contract.[4] On the other hand, "close scrutiny" is traditionally applied to employment contracts with restrictive covenants to ensure that they are strictly limited in duration, territory, and prohibited activities.[5] While a covenant not to compete that is part of the sale of a business interest can be blue-penciled to sever an unreasonable or an overbroad provision, a similar restrictive covenant that is part of an employment contract cannot be rewritten.[6]

"In determining the reasonableness of a covenant not to compete, greater latitude is allowed in those covenants relating to the sale of a business than in those covenants ancillary to an employment contract."[7] Here, the trial court decided that the noncompetition agreement at issue was part of the sale of Atlanta Metal's business to Amerimax. Notwithstanding any claim to the contrary, this is correct. It is undisputed that Hudgins's employment terminated when Atlanta Metal was sold, so the covenant not to compete was not ancillary to continued employment.

Special considerations often arise in the sale of a business.

---

[2] *Northside Hosp. v. McCord*, 245 Ga. App. 245, 247 (1) (537 SE2d 697) (2000); *Habif, Arogeti & Wynne, P.C. v. Baggett*, 231 Ga. App. 289-290 (1) (498 SE2d 346) (1998).

[3] *Jenkins v. Jenkins Irrigation*, 244 Ga. 95, 98-99 (259 SE2d 47) (1979).

[4] *Drumheller v. Drumheller Bag & Supply*, 204 Ga. App. 623, 626 (1) (420 SE2d 331) (1992).

[5] *Ceramic & Metal Coatings Corp. v. Hizer*, 242 Ga. App. 391, 392 (529 SE2d 160) (2000).

[6] *Watson v. Waffle House*, 253 Ga. 671, 672 (2) (324 SE2d 175) (1985).

[7] (Citations omitted.) *Dalrymple v. Hagood*, 246 Ga. 235, 236 (271 SE2d 149) (1980).

"When a person sells a business and covenants not to compete in a certain territory, the buyer pays and the seller receives a part of the total purchase price as consideration for that covenant. The buyer frequently would not buy the business if the seller were free to begin competing immediately."[8] And, as this Court noted:

> Where the sale of a business is involved, the purchaser's interest in what he has acquired cannot be effectively realized unless the seller agrees not to act so as to diminish the value of what has been sold. See Restatement of the Law of Contracts, Second, § 188, Comment (b). It follows that the reasonableness of any covenant not to compete ancillary to the sale of a business must be measured on the basis of whether the restricted activity protects the purchaser's legitimate business interests, i.e., the value of the business and its good will.[9]

Here, Amerimax offered evidence that the restrictive covenants were a significant part of the transaction. Neil Bashore, executive vice president of the parent company of Amerimax, testified that "Amerimax would not have acquired Atlanta Metal if the stockholders of Atlanta Metal did not agree to execute non-competition agreements." Bashore testified that the execution of the noncompetition agreement was "a material condition to the stock purchase agreement." Bashore attested that "[i]n exchange for entering these non-competition agreements, the Atlanta Metal stockholders received additional compensation, or good will, for their shares of stock. The good will received by the Atlanta Metal stockholders was over $8.5 million."

Hudgins argues that because of his status as a minority shareholder, he had little or no bargaining power in the sale of his employer's business and, therefore, the restrictive covenants should have been subjected to strict scrutiny and treated as ancillary to an employment contract. Since Hudgins did not have continued employment or an employment contract, his reliance upon cases construing noncompetition agreements ancillary to employment contracts is misplaced.[10] Efforts to analogize his bargaining position to that of a "mere employee" are unpersuasive.[11] His own testimony belies his complaint that he had no greater bargaining power than a "mere employee." Hudgins testified that he did not attempt to negotiate dif-

---

[8] *Jenkins*, supra, 244 Ga. at 100 (3).

[9] (Citations omitted.) *Drumheller*, supra, 204 Ga. App. at 627-628 (3).

[10] Compare *S. Hammond Story Agency v. Baer*, 202 Ga. App. 281 (414 SE2d 287) (1991).

[11] Compare *White v. Fletcher/Mayo/Assoc.*, 251 Ga. 203, 208 (303 SE2d 746) (1983).

ferent terms with Amerimax, not because he was unable to do so but because he did not want to defeat the acquisition or to undertake an action that would "quell the deal." Accordingly, we find that the trial court applied the appropriate level of review and did not err in finding that the "Noncompetition and Nonsolicitation Agreement" is an enforceable document.[12]

2. Hudgins asserts that the trial court erred in determining that the terms of the agreement are reasonable and are not an unconstitutional restraint of trade or against the public policy of this State. He claims that under any standard of review the terms of the restrictive covenants are "patently unreasonable."

Hudgins candidly admits, "I want to open a rain-carrying manufacturing plant in North Georgia, and re-establish contact with [Atlanta Metal's] former customers in the area. . . ." He admittedly wants to serve what he describes as "a tremendous customer base" located in the Alpharetta area. But, engaging in these activities is exactly what Hudgins promised not to do for three years. Prohibiting these precise activities is the legitimate function of sale of business restrictive covenants.

However, the reasonableness of restrictive covenants in terms of the activities proscribed, the duration of the restrictions, and the territory to which they apply must be measured against whether the restrictions on the seller protect the purchaser's legitimate business interests, the value of the business, and its good will.[13] Here, the proscribed activity of competing in the rain-carrying product and metal roofing business and the three-year limit seem reasonably necessary to protect Amerimax's legitimate business interests.[14] Nevertheless, Hudgins contends that he should not be precluded from seeking employment in the same industry in 25 states or from soliciting customers with whom he personally had no contact.[15]

Territorial limitations arising in the sale of stock in a business must be reasonable.[16] Isolated transactions in the periphery may be disregarded in determining the area legitimately served by the seller at the time of sale.[17] "Where a covenant not to compete made by a seller in conjunction with the sale of a business designates an area greater than that reasonably necessary to protect the buyer, the

---

[12] See *Carroll v. Ralston & Assoc.*, 224 Ga. App. 862, 864 (481 SE2d 900) (1997).

[13] See *Klein v. Williams*, 212 Ga. App. 39, 41-42 (3) (441 SE2d 270) (1994).

[14] See *Jenkins*, supra, 244 Ga. at 98 (2) (covenant not to compete made in conjunction with the sale of a business may be unlimited as to time, so long as buyer remains in business, and still be valid).

[15] Exhibit A lists 25 states as the "territory." An alphabetical list of customers provides the names of customers that cannot be solicited.

[16] *Jenkins*, supra, 244 Ga. at 99 (2).

[17] Id. at 101 (3).

court will enjoin the seller from competing in only so much of that area as it finds from the clear and convincing evidence is essential to protect the buyer."[18]

The parties stipulated that the majority of Atlanta Metal's customers were within a 150-mile radius of Atlanta, with some customers located elsewhere in Georgia, Alabama, Tennessee, South Carolina, and North Carolina.[19] Amerimax has not offered clear and convincing evidence to show that precluding Hudgins from competing in or soliciting customers in all 25 states on the list is essential to protecting its purchase of Atlanta Metal.[20] Therefore, we remand for the trial court to conduct an evidentiary hearing to determine whether the otherwise enforceable restrictions should apply to a smaller geographical area.[21]

*Judgment affirmed in part and reversed in part and case remanded with direction. Smith, P. J., and Barnes, J., concur.*

### DECIDED JUNE 29, 2001.

*Richard A. Gordon, Cammi R. Jones*, for appellant.
*Arnall, Golden & Gregory, Charles L. Gregory, Richard A. Mitchell*, for appellee.

---

[18] (Citation and punctuation omitted.) *Klein*, supra, 212 Ga. App. at 40-41 (2).

[19] In addition to Georgia and the four other states, Bashore testified that "Atlanta Metal transacted significant business in other states as well and sold products to customers in 25 states."

[20] Compare *Klein*, supra, 212 Ga. App. at 41 (2).

[21] See *Reed v. Eastern Elec. Apparatus Repair Co.*, 194 Ga. App. 650, 651-652 (391 SE2d 472) (1990).