A03A0813. WEST COAST CAMBRIDGE, INC. et al. v. RICE.

(584 SE2d 696)

MIKELL, Judge.

West Coast Cambridge, Inc. ("Cambridge") and South Georgia Lithotripsy Partners (the "Partnership") sued Samuel T. Rice, M.D., for breach of a noncompete agreement. Cambridge and the Partnership appeal the trial court's order granting Rice's motion for summary judgment and denying their motion for partial summary judgment. For the reasons stated below, we reverse the grant of summary judgment to Rice and remand with instructions. We affirm the trial court's denial of Cambridge's and the Partnership's motion for partial summary judgment.

To prevail on a motion for summary judgment, the moving party must demonstrate that there is no genuine issue of material fact, and that the undisputed facts, viewed in a light most favorable to the party opposing the motion, warrant judgment as a matter of law.[1] To obtain summary judgment, a defendant need not produce any evidence, but must only point to an absence of evidence supporting at least one essential element of the plaintiff's claim.[2] Our review of a grant of summary judgment is de novo, and we view the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmovant.[3]

Rice is a urologist whose medical practice includes lithotripsy. Lithotripsy is a noninvasive medical procedure which involves the use of a machine called a lithotripter to dissolve kidney stones through shock waves, among other techniques. Rice owns four percent of South Georgia Lithotripsy Associates, Inc. ("Associates"). The other shareholders are also physicians. In 1990, Associates and Coliseum Park Hospital, Inc. ("Coliseum Park") formed a partnership known as South Georgia Lithotripsy, J.V. (the "Joint Venture"). The Joint Venture purchased a lithotripter which it leased to various hospitals on a rotating basis.

---

[1] OCGA § 9-11-56 (c); Lau's Corp. v. Haskins, 261 Ga. 491 (405 SE2d 474) (1991).

[2] Id.

[3] Supchak v. Pruitt, 232 Ga. App. 680, 682 (1) (503 SE2d 581) (1998).

In 1992, T2 Medical, Inc. ("T2") purchased Coliseum Park's interest in the Joint Venture. T2 and the Joint Venture then entered into the Partnership. Pursuant to the formation of the Partnership, Associates's shareholders, including Rice, received significant monetary consideration from T2. Rice received either $100,000 or $200,000 for "some of [his] interests" in Associates. Rice continued to receive a return attributable to his investment in the Partnership of approximately $24,000 to $25,000 per year. Through a series of transactions, Cambridge became the owner of T2's interest in the Partnership.

As contemplated by the partnership agreement between T2 and the Joint Venture (the "Partnership Agreement"), the shareholders of Associates, including Rice, entered into a Non-Compete and Investment Representation Agreement (the "Non-Compete Agreement"). Under Section 2.1 of the Non-Compete Agreement, the shareholders of Associates agreed that, during the Partnership's existence and for a period of three years after its termination, they would not engage in a business that competed with the Partnership.[4]

Rice deposed that in March 1999, he invested $7,000 or $8,000 in SOCAGA Lithotripsy, LLC ("SOCAGA"), that in August 1999, SOCAGA contracted to provide a lithotripter to St. Francis Hospital in Columbus, Georgia, and that as of June 7, 2001, he had received $50,000 or $60,000 from his investment in SOCAGA. On October 30, 2000, Cambridge and the Partnership sued Rice for breach of contract, claiming that his investment in SOCAGA violated the Non-Compete Agreement.

The trial court granted Rice's motion for summary judgment, holding that (i) the Non-Compete Agreement was unenforceable as a matter of law; (ii) no question of material fact remained as to Rice's violation of the Non-Compete Agreement; and (iii) T2 could not assign Rice's obligation under the Non-Compete Agreement.

1. Cambridge and the Partnership claim that the trial court erred in reviewing the Non-Compete Agreement using a middle degree of scrutiny. We agree.

---

[4] Section 2.1 of the Non-Compete Agreement provides in relevant part:
During the existence of the Partnership and for a period of three (3) years from the termination thereof, no Partner shall (without obtaining the prior written consent of the Partnership and T2), directly or indirectly, on his own behalf or in the service of or on the behalf of others, as a director, trustee, owner (except as an owner of less than 5% of the outstanding stock of a publicly-owned corporation), employee, consultant, advisor, independent contractor or in any other capacity engage in a business that is the same as or essentially the same as the Business (a "Competing Business") or receive any compensation in such capacities, directly or indirectly, from a Competing Business, within a fifty (50) mile radius of each of the following locations. . . .

Restrictive covenants may be unenforceable as an impermissible restraint of trade.[5] However,

> a restrictive covenant . . . will be upheld if the restraint imposed is not unreasonable, is founded on a valuable consideration, and is reasonably necessary to protect the interest of the party in whose favor it is imposed, and does not unduly prejudice the interests of the public.[6]

Restrictive covenants ancillary to the sale of a business traditionally have been afforded a substantial degree of protection by the Georgia courts and are viewed with the least degree of scrutiny.[7] Conversely, covenants not to compete which are part of an employment contract receive close scrutiny to ensure that they are strictly limited in duration, territory, and prohibited activities.[8] In between these two standards of review is the "middle level of scrutiny," which is generally applied to restrictive covenants ancillary to professional partnership agreements.[9]

Recently, we found that the level of scrutiny is not directly tied to the type of contract under consideration.

> [W]e [do not] believe that the type of contract should automatically determine the applicable level of scrutiny. Rather, we must look to the purposes behind the varying levels of scrutiny to determine which level is most appropriate for the contract before us. One starting point is the relative bargaining power of the parties. . . . Another factor this Court has considered is whether there is independent consideration for the restrictive covenant itself.[10]

Cambridge and the Partnership claim that the Non-Compete Agreement was entered into in connection with the sale of a business and so should be reviewed with a lesser degree of scrutiny. As support for this argument, Cambridge and the Partnership show that T2 required Associates's shareholders to execute the Non-Compete

---

[5] See OCGA § 13-8-2; *Rash v. Toccoa Clinic Med. Assoc.*, 253 Ga. 322, 323 (1) (320 SE2d 170) (1984).

[6] (Punctuation omitted.) *W. R. Grace & Co. v. Mouyal*, 262 Ga. 464, 465 (1) (422 SE2d 529) (1992), citing *Rakestraw v. Lanier*, 104 Ga. 188, 194 (30 SE 735) (1898).

[7] See *Attaway v. Republic Svcs. of Ga.*, 253 Ga. App. 322, 325 (558 SE2d 846) (2002).

[8] *Hudgins v. Amerimax Fabricated Products*, 250 Ga. App. 283, 285 (1) (551 SE2d 393) (2001).

[9] See *Physician Specialists in Anesthesia v. MacNeill*, 246 Ga. App. 398, 402 (2) (a) (539 SE2d 216) (2000).

[10] *Swartz Investments v. Vion Pharmaceuticals*, 252 Ga. App. 365, 368-369 (2) (556 SE2d 460) (2001).

Agreement in connection with Coliseum Park's sale of its interest in the Joint Venture, that Associates's shareholders received substantial compensation from the transaction, and that the shareholders and Rice continued to receive an annual return from what Rice characterizes as an investment.

Rice argues that the Non-Compete Agreement should be viewed in the context of a professional partnership agreement. Rice shows that the language of the Non-Compete Agreement prevents all of the physician shareholders of Associates from engaging in a business competing with the Partnership. Rice asserts that the business of the Partnership is the provision of lithotripsy services, and so the Non-Compete Agreement potentially restricts Rice in the performance of his medical practice as a urologist. Rice also contends that the practical effect of the Non-Compete Agreement is to force him and the other physician shareholders of Associates to perform lithotripsy procedures using the lithotripter owned by the Partnership. The result, Rice contends, is to restrict his medical practice in the same manner as a professional partnership agreement.

Rice also claims that his lack of bargaining power makes it inappropriate to view the transaction as similar to the sale of a business. In that situation, the seller who agrees to the restrictive covenants is often in an equal bargaining position with the prospective purchaser.[11] Rice, as a four percent minority shareholder in Associates, maintains that he cannot be shown to have had significant bargaining power with respect to the transaction.

We find, however, that the transaction at issue here is more akin to the sale of a business than a professional partnership agreement. Our research shows that a basic characteristic of professional partnership agreements is that the contracting professional expects to derive economic benefits through active participation in the professional partnership or corporation.[12] Here, Rice benefitted through a passive investment. He did not practice medicine with the Partnership.

We are also unpersuaded that Rice's lack of bargaining power demands that we review the Non-Compete Agreement under a middle level of scrutiny. Rice claims that he was faced with the choice of either agreeing to the transaction with T2 or losing his investment. But this was not a contract of adhesion. Rice was not asked to sign a restrictive covenant in exchange for an opportunity to practice his profession. Nor could it be said that Rice was insignificant to the

---

[11] See id. at 369 (2).

[12] See *Rash*, supra; *Carroll v. Harris*, 243 Ga. 34 (252 SE2d 461) (1979); *Raiford v. Kramer*, 231 Ga. 757 (204 SE2d 171) (1974); *Rakestraw*, supra; *Physician Specialists*, supra; *Roberts v. Tifton Med. Clinic*, 206 Ga. App. 612 (426 SE2d 188) (1992).

transaction. The record shows that T2 required all the shareholders of Associates to execute the Non-Compete Agreement as a material consideration for entering into the Partnership.[13] In context, Rice's bargaining position was more akin to that of an investor or owner than to an active member of a group of practicing professionals.

In sum, we are presented with restrictive covenants executed by Rice in connection with a transaction in which he received, and continues to receive, significant monetary consideration for what he characterized as the sale of a portion of his ownership in Associates. The transaction is comparable to the sale of a business and should be treated as such. Accordingly, the trial court erred when it examined the Non-Compete Agreement using the middle level of scrutiny. We reverse the grant of summary judgment to Rice, and remand for the trial court to review the Non-Compete Agreement using the degree of scrutiny appropriate for the sale of a business.

2. (a) Cambridge and the Partnership claim that the trial court erred in finding that they presented no evidence creating a question of fact as to whether Rice violated the Non-Compete Agreement. Again, we agree.

Under the terms of the Non-Compete Agreement, the business of the Partnership is defined as the "business of providing lithotripsy services." The trial court found that the only evidence in the record regarding the meaning of the term "provision of lithotripsy services" was the deposition testimony of the Partnership's OCGA § 9-11-30 (b) (6) agent, who defined the term as the operation of the lithotripter by the physician to dissolve stones.

Rice deposed that the Partnership contracted to provide lithotripters to Doctors Hospital in Columbus. Rice further deposed that SOCAGA owned a lithotripter which it contracted for the use of St. Francis Hospital, which is also located in Columbus and is within the territorial limit specified by the Non-Compete Agreement. In the hearing before the trial court, Rice admitted that SOCAGA and the Partnership are in the same business.

Rice argues, as he did in the trial court, that neither SOCAGA nor the Partnership provided lithotripsy services for purposes of the Non-Compete Agreement because neither business involved the operation of lithotripters by physicians. The flaw in this reasoning is that it was not necessary for the trial court to consider parol evidence to adduce the meaning of the term "provision of lithotripsy services" for purposes of the Non-Compete Agreement.[14] The contractual lan-

---

[13] See, e.g., *Hudgins*, supra at 285 (1) (minority shareholder declined to attempt to negotiate a noncompete agreement for fear that he would "quell" the deal).

[14] OCGA § 13-2-2 (1). See *Stonecypher v. Ga. Power Co.*, 183 Ga. 498, 501 (189 SE 13) (1936) ("The rule of law that the terms of a valid written agreement, which is complete and

guage was not ambiguous in the context of this dispute. Furthermore, the intent of the parties is the cornerstone of contract construction,[15] and it is not credible that the parties to the Non-Compete Agreement intended to restrict competition in a business in which the Partnership did not engage. We conclude that the trial court erred in granting summary judgment to Rice on the basis that there was no question of material fact as to Rice's violation of the Non-Compete Agreement.

(b) The trial court also found that the Non-Compete Agreement was unenforceable because it was a personal services contract and was not assignable by T2. The Partnership and Cambridge contend that this finding was in error, and we agree. There is no prohibition against the assignment of the Non-Compete Agreement by T2, and the Non-Compete Agreement is expressly binding on successors and assigns. Rice was not required to perform any personal services under the Non-Compete Agreement, although he remained obligated not to do certain things. We have explained the basis behind the non-assignability of certain personal services contracts as follows:

> While contract rights and duties are generally assignable and delegable, duties may not be delegated where performance by the delegate would materially vary from the performance required by the original obligor. Thus, certain classes of contracts are inherently non-assignable in their character, such as promises to marry, or engagements for personal services, requiring skill, science, or peculiar qualifications.[16]

T2 had no outstanding material obligations under the Non-Compete Agreement, and we can find no impairment to the assignment of its rights under the contract.[17] "Since it was only [Rice] who owed any further potential duty under the contract and since no personal confidences were involved in connection with the countervailing contractual right to enforce that duty, the instant case would come within the general rule of assignability of contract rights."[18]

---

the terms of which are not ambiguous, can not be contradicted, added to, altered, or varied by parol agreements, is a settled legal proposition.").

[15] See *McAbee Constr. Co. v. Ga. Kraft Co.*, 178 Ga. App. 496, 498 (343 SE2d 513) (1986) (cardinal rule of contract construction is to ascertain the intention of the parties by looking at the contract as a whole).

[16] (Citations, punctuation and emphasis omitted.) *Decatur North Assoc. v. Builders Glass*, 180 Ga. App. 862, 865 (2) (350 SE2d 795) (1986).

[17] See id.

[18] Id.

3. Rice argues the Non-Compete Agreement is unenforceable because it violates the federal anti-kickback statute. The trial court did not rule on this issue, although it was argued below. In pertinent part, the statute applies to

> [w]hoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind — (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.[19]

The Non-Compete Agreement restricts referrals by Rice to those competing businesses in which he has an ownership interest or compensation arrangement. It does not provide any compensation for referrals to the Partnership. The referral provision is also subject to the limitation that "a patient's treatment shall be dictated by such patient's needs." We find no "kickback," direct or indirect, stated or implied, in the Non-Compete Agreement.

4. Cambridge and the Partnership moved for partial summary judgment on the issue of Rice's liability under the Non-Compete Agreement. Material issues of fact remain as to whether Rice executed a signature page to the final Non-Compete Agreement or to an earlier, superseded document. Questions of fact also remain as to the reasonableness of the Non-Compete Agreement under the lesser standard of scrutiny. We find that the trial court correctly denied the motion for partial summary judgment.

*Judgment affirmed in part and reversed in part and case remanded with direction. Johnson, P. J., and Eldridge, J., concur.*

DECIDED JULY 2, 2003.

*Page, Scrantom, Sprouse, Tucker & Ford, Robert C. Brand, Jr., Andre & Blaustein, S. Wade Malone*, for appellants.
*Richard A. Childs*, for appellee.

---

[19] 42 USCS § 1320a-7b (b).