**ORTHODONTIC AFFILIATES, P.C., Plaintiff,**

v.

**ORTHALLIANCE, INC., f/k/a U.S. Orthodontic Care, Inc., Defendant.**

**No. 2:01 CV 516.**

United States District Court, N.D. Indiana, Hammond Division.

April 22, 2002.

John Kappos, Merrillville, IN, for plaintiff.

David C. Jensen, John P. Twohy, Michael P. Mulchay, Eichhorn & Eichhorn,

Stewart E. Niles, Jr., Joseph J. Lowenthal, Jr., Jones, Walker, Waechter Poitevent, Carrere and Denegre LLP, New Orleans, LA, for defendant.

## *ORDER*

MOODY, District Judge.

This matter comes before the court on cross-motions for summary judgment, and Plaintiff's motion to dismiss Defendant's counterclaim for fraud. Before addressing the legal questions, the court will set forth the context that lead to this dispute.

## I. BACKGROUND

Plaintiff is an Indiana professional corporation, whose members are orthodontists. Defendant is the nation's second-largest orthodontics practice-management company. *See* Michael Perrault, *Orthodontists File Suit Against Consulting Firm*, ROCKY MOUNTAIN NEWS (Denver), Mar. 8, 2002, at 3B. Orthodontic practice-management companies do what the name suggests: orthodontists sign long-term agreements to use a "company's business operating systems for everything from buying equipment to billing clients."[1] Ronnette King, *Money Where Your Mouth Is*, THE TIMES-PICAYUNE (New Orleans), Feb. 17, 2002, at 1. This type of relationship is truly symbiotic. An orthodontist benefits from Defendant's expertise (and resulting efficiency) in business management, which allows the practitioner more time to ply his/her trade and to see more patients. Moreover, the deep discounts that companies like Defendant's can command for medical supplies translates into lower operating costs. In return, management companies like Defendant's assess a (not-so-meager) monthly fee. The key is the long-term nature of these relationships. These deals are structured in such a manner that the orthodontist's greatest benefit comes in the early years of the arrangement.[2] As the relationship proceeds, the management company recoups its investment, and ultimately profits from the deal. In other words, the management company's profit increases as time goes by; the orthodontist's profit is inversely related. Because of this mismatch in timing, one could easily envision the symbiosis turning to enmity.

On November 9, 2001, Defendant and Orthodontic Centers of America, Inc., ("OCA") merged. Defendant is now a wholly-owned subsidiary of OCA. *See Orthodontic Centers of America and OrthAlliance Announce Completion of Merger*, PR NEWSWIRE, Nov. 9, 2001 (*available in* LEXIS, News Group File). "Before the deal, some of the OrthAlliance doctors were unhappy with their arrangement." King, *supra* at 1. Many were dismayed because their profits failed to meet projections; the loss of autonomy over certain business decisions bothered others. *See id.* In either case, since the merger, orthodontists have sought ways to end their practice-management relationships before the contracts expire (which for most, is more than a decade into the future). Toward that end, many of these practitioners (like Plaintiff) have filed suits against Defendant. *See id.*

---

1. The duration of the contract at issue in this litigation is twenty years. (*See* Pl.Compl. at Ex. A ("Service Agreement"), ¶ 5.1.)

2. The initial investment in a patient makes this the economic reality of orthodontics. "Orthodontists lost money (initially) because when they put braces on a kid's teeth, between 30 to 40 percent of the total cost of treatment is expended in the first month: making the molds, doing diagnostics, the expense for fabrication...." King, *supra* at 1. By offering monthly payment plans, management companies make orthodontic services more widely available to the public at-large, and minimize the risk that flows from new patients. *See id.*

## II. LEGAL STANDARD

The court will first address the cross-motions for summary judgment. "A grant of summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gordon v. United Airlines*, 246 F.3d 878, 885 (7th Cir.2001); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548 (citing FED.R.CIV.P. 56(c)). In this district, concomitant with every summary judgment motion, "there shall be a 'Statement of Material Facts,' supported by appropriate citations to discovery responses, depositions, affidavits, and other admissible evidence, as to which the moving party contends there is no genuine issue." N.D.Ind.L.R 56.1(a). Strict adherence to the local rules is necessary, particularly on summary judgment, to ensure the trial court can organize undisputed facts and efficiently determine whether the action requires a trial. *See Hedrich v. Bd. of Regents of University of Wisconsin System*, 274 F.3d 1174, 1178 (7th Cir.2001) (supporting punishment for ignoring local rules of court); *Markham v. White*, 172 F.3d 486, 490 (7th Cir.1999) (lauding district court for enforcing local rules); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922–23 (7th Cir.1994) (approving "no quarter" approach to local rule compliance). The law of summary judgment in the federal courts further imposes upon the moving party to demonstrate that those undisputed facts form a basis to secure judgment as a matter of law. This requires the party to link sufficient facts to every essential element of the case for which that party bears the burden of proof. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Failure to do so necessitates a denial of the motion. *See id.* The governing legal rules guide this consideration. *See Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir.2001); *McGinn v. Burlington Northern R.R. Co.*, 102 F.3d 295, 298 (7th Cir.1996).

If the moving party successfully clears these hurdles, the court's focus shifts to the non-movant. At that point, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided ... must set forth specific facts showing there is a genuine issue for trial." FED.R.CIV.P. 56(e); *see Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (imposing upon non-movant to produce sufficient evidence); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (requiring more than a "metaphysical doubt" to survive summary judgment). In this district, responding to a summary judgment motion includes tendering a "Statement of Genuine Issues," designed to isolate "all material facts as to which it is contended there exists a genuine issue necessary to be litigated." N.D.Ind.L.R 56.1(a). "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." FED.R.CIV.P. 56(e). In the course of considering the motion(s), the court views all factual inferences in a light most favorable to the non-moving party. *See Hilt–Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir.2002); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Basith v. Cook County*, 241 F.3d 919, 926 (7th Cir. 2001).

Lastly, Indiana courts, both state and federal, acknowledge that "contract interpretation is often a question of law well suited for disposition on summary judgment." *Zemco Mfg., Inc. v. Navistar Intern. Transp. Corp.*, 270 F.3d 1117, 1127 (7th Cir.2001) (invoking Indiana law); *accord Ferrell v. Dunescape Beach Club Condominiums*, 751 N.E.2d 702, 709 (Ind. Ct.App.2001).

## III. DISCUSSION

Three contracts comprise the crux of the dispute in this litigation. In Count I of its complaint, Plaintiff alleges the management service agreement ("Service Agreement"), executed November 1, 1996, is a contract calling for Defendant to unlawfully engage in the practice of dentistry within the State of Indiana. According to Plaintiff, this makes the Service Agreement invalid and unenforceable; Plaintiff seeks a declaratory judgment stating same. In Count II of its complaint, Plaintiff seeks a declaratory judgment stating that it has the right to amend the two employment agreements it has entered into with Thomas W. Surber, D.D.S., and Randall A. Schmidt, D.D.S., without Defendant's consent. Defendant moved for summary judgment on both claims.

### A. Count I

■ Section 23(a) of the Indiana Dental Practices Act ("IDPA") provides in pertinent part: "A person is practicing dentistry within the meaning of this chapter if the person ... (13)[e]xercises direction or control over a dentist through a written contract concerning ... (F) [f]inal decisions relating to the employment of dental office personnel." IND.CODE ANN. § 25–14–1–23 (West 2001). Plaintiff points to seven pro-

visions within the Service Agreement that it believes falls within the purview of the previously-quoted statute. In this State, a contractual duty requiring a party to engage in a course of conduct fundamentally in contravention of Indiana law is invalid and unenforceable. *See Schornick v. Butler*, 205 Ind. 304, 185 N.E. 111, 112–13 (1933); *see also Freeman v. Mayer*, 95 F.3d 569, 575 (7th Cir.1996); *Kaszuba v. Zientara*, 506 N.E.2d 1, 2 (Ind.1987). The issue in this case, therefore, is whether the Service Agreement allowed Defendant to exercise control over "[f]inal decisions· relating to the employment of dental office personnel." If so, Defendant is engaging in practice of dentistry without a license (thereby making it unlawful), and those portions of the Service Agreement are invalid and unenforceable. In determining the enforceability of various contractual provisions, this court must "consider the relative benefit which the party seeking to avoid the bargain has enjoyed." *Norlund v. Faust*, 675 N.E.2d 1142, 1151 (Ind.Ct. App.1997).[3] In addition, Indiana courts only declare contractual provisions invalid as violative of public policy "in cases which are substantially free from doubt." *Lexington Ins. Co. v. American Healthcare Providers*, 621 N.E.2d 332, 338 (Ind.Ct. App.1993). Such a determination is especially well-suited for adjudication upon summary judgment. *See Ferrell*, 751 N.E.2d at 709.

Unfortunately, "Indiana publishes only sparse legislative history," *Shell Oil Co. v. Meyer*, 705 N.E.2d 962, 974 (Ind.1998), and none has surfaced on that portion of the IDPA implicated by this litigation. Lack of legislative history, coupled with no Attorney General opinions on the subject,[4]

---

**3.** This "relative benefit" requirement of Indiana contract law makes the background of this case particularly important. *See supra* Part I (discussing the long-term nature of the parties' agreement).

**4.** The Indiana Legislature placed a duty upon the Attorney General to represent the State Board of Dentistry in any court proceeding. *See* IND.CODE ANN. 25–14–1–21 (West 2001).

leaves only some case law (and a rule of construction embedded in the IDPA itself) to aid the court's interpretive task. The Indiana Supreme Court first opined on the regulation of dentists in *State v. Williams,* stating "[t]he profession of dentistry is not a business, but one of the learned professions which requires long years of study before one is capable of practicing the profession ... and anyone who is not so qualified can neither directly nor indirectly practice dentistry." 211 Ind. 186, 5 N.E.2d 961, 966 (1937). Then, in *Ice v. State,* 240 Ind. 82, 161 N.E.2d 171, 172–73 (1959), the Court recognized that the purpose of regulating the practice of dentistry was to ensure the safety and health of the citizens of Indiana. Lastly, Section 29 of the IDPA provides that "[t]his chapter shall be deemed to be enacted in the interests of public health, safety, and welfare, and its provisions shall be liberally construed to serve such interests." IND.CODE ANN. 25–14–1–29 (West 2001).

Some guiding principles flow from the court's review of these texts. The general purpose of the IDPA is to protect Indiana citizens by ensuring practitioners meet minimum standards. IDPA, particularly section 23(a)(13),[5] by identifying "areas of dental practice" such as courses of treatment, patient referrals, patient records, clinical content of advertising, and "employment of dental office personnel," seeks to insulate dental practitioners from obtrusive influences so as to preserve the traditional ethical precepts of the profession. *Cf. Hojnacki v. Klein–Acosta, et al.,* 285 F.3d 544, 551 (7th Cir.2002) (referencing "the ethical standard that all doctors adopt with the Hippocratic Oath, and no doctor would allow a lay person to overrule her clinical judgment"). The statute and case law also suggest a distinction between the professional pursuit of dentistry, and the business objectives necessarily intertwined with such practice. IDPA only intends to regulate the former. Bringing these guiding principles to bear upon the issue before the court leads to the conclusion that "dental office personnel" as that term appears in IDPA section 23(a)(13)(F) refers to persons employed to work on patients' teeth, such as hygienists, dental assistants, and technicians; *not* to secretarial staff, receptionists, and accounts payable/receivable clerks. With this in mind, the court turns to the specific provisions of the Service Agreement (seven to be exact) that Plaintiff contends permit the Defendant to engage in unlawful practice of dentistry, in violation of IDPA section 23(a)(13)(F).

▮ First, Plaintiff points to paragraph 1.1 of the Service Agreement which provides (as pertinent here):

"USOC[6] shall provide the Orthodontic Entity[7] with comprehensive practice management, financial and marketing services, and such facilities, equipment, and *support personnel* as reasonably required by the Orthodontic Entity to operate its practice, as determined by USOC in consultation with the Orthodontist.... The Orthodontic Entity hereby appoints USOC as the sole and executive business manager of the Center and agrees that USOC shall have all power and authority reasonably necessary to *manage the business affairs* of the Center and carry out USOC's duties under this Agreement, *subject to the requirements of the applicable provi-*

---

**5.** Section 23(a)(13) of IDPA became effective July 1, 2001. *See* P.L. 102–2000, § 2.

**6.** As mentioned in the case caption, Orthalliance was formerly known as U.S. Orthodontic Care, Inc. ("USOC").

**7.** The Service Agreement refers to Plaintiff as the "Orthodontic Entity."

1060

sions of Indiana law relating to the practice of dentistry."
(Service Agr. at ¶ 1.1 (emphasis added).) The plain text of this provision is clear: Defendant has the contractual obligation to render business services and provide the business personnel necessary to discharge this duty. Moreover, the contractual obligation to render these services is *explicitly subject* to the regulation of dental practice in Indiana. So, if a certain course of conduct constitutes unlawful practice of dentistry under Indiana law, the Service Agreement *requires* that Defendant refrain from engaging in that proscribed conduct.

■ Next, Plaintiff points to paragraph 1.3 of the Service Agreement which states

USOC shall employ all of the Center's *staff*, except the Orthodontists, as determined by the Orthodontic Entity in consultation with USOC, to be required for the operation of the Center. Additionally, USOC shall be responsible for the performance of all payroll and payroll accounting functions.

(*Id.* at ¶ 1.3 (emphasis added).) The term "staff" is ambiguous when considered in isolation. If it includes persons who actually work on patient's teeth, it could permit Defendant to exercise control over employment decisions of "dental office personnel" in contravention of IDPA section 23(a)(13)(F). The context, however, leads the court to conclude the term only relates to business personnel. *Accord Beanstalk Group, Inc. v. AM General Corp. and General Motors*, 283 F.3d 856, 860 (7th Cir.2002) ("Sentences are not isolated units of meaning, but take meaning from other sentences in the same document."). The parties titled the paragraph "Personnel and Payroll," leading a reasonable observer to conclude there is a substantial relationship between the second sentence, obligating Defendant to provide payroll services, clearly *not* the sort of

activity within the purview of dentistry, and the first sentence which indicates Defendant employs the staff, except for the orthodontists. Moreover, Doctor Schmidt who signed the Service Agreement on behalf of Plaintiff, made statements subsequent to execution of the Agreement that indicate his understanding that the orthodontists retained exclusive control over Plaintiff's dental practice. (*See* Sam Westover Aff. at Ex. F, p. 2 ("[W]e don't change anything about our practice that we don't choose to change.").)

■ Next, Plaintiff argues paragraph 2.6 is unenforceable because it requires a course of conduct deemed unlawful under section 23(a)(13) of IDPA. The relevant contractual provision states as follows: "[E]ach Orthodontist who is or becomes an equity owner of the Orthodontic Entity ... shall enter into an employment agreement with the Orthodontic Entity...." (Service Agr. at ¶ 2.6.) Plaintiff was therefore obliged to enter into employment agreements with Doctor Schmidt and Doctor Surber. These employment contracts were executed on November 1, 1996. Even assuming that entering into employment contracts with orthodontists constitutes unauthorized practice of dentistry, it was Plaintiff who agreed to engage in the unlawful act. Plaintiff's objection to paragraph 2.9 suffers from the same infirmity. Paragraph 2.9 contains Plaintiff's promise to refrain from competing against Defendant for two years. (*See id.* at ¶ 2.9.) If this act constitutes an unauthorized practice of dentistry, Plaintiff is the culpable party, and as a result, it has no remedy.

Plaintiff's other claims, specifically with regard to paragraphs 1.2, 1.11, and 2.2, are without merit. In fact, relevant portions of paragraph 2.2 bolster *Defendant's* position that the Service Agreement does not call for unauthorized practice of dentistry. (*See* Service Agr. at ¶ 2.2 ("The Orthodon-

tic Entity ... shall comply with all applicable local rules, ordinances, and all standards of dental and orthodontic care ... The Orthodontic Entity shall ensure that each orthodontist providing orthodontic or dental services to patients is licensed by the state in which the Center is located.").)

## B. Count II

In Count II of its complaint, Plaintiff seeks a declaration that it may amend the employment agreements entered into with Doctors Schmidt and Surber ("Employment Agreements"), without prior consent from Defendant, who is not a party to the Agreements. Defendant seeks summary judgment contending it is a third-party beneficiary to the Employment Agreements, and therefore, its consent is a necessary precondition to any amendment(s).

 Under Indiana contract law principles, only parties have contractual rights. *See Gonzales v. Kil Nam Chun*, 465 N.E.2d 727, 729 (Ind.Ct.App.1984). The parties, however, have the freedom to provide contractual rights to persons and entities not themselves parties to the agreement. *See Garco Indus. Equip. Co. v. Mallory*, 485 N.E.2d 652, 654 (Ind.Ct.App. 1985). "A third-party beneficiary contract is one in which the promisor has a legal interest in performance in favor of the third party and in which the performance of the terms of the contract between two parties must necessarily result in a direct benefit to a third party which was so intended by the parties." *Centennial Mortg., Inc. v. Blumenfeld*, 745 N.E.2d 268, 275 (Ind.Ct.App.2001). "[T]he contract may not be rescinded, revoked or modified to the detriment of the third-party beneficiary," *NN Investors Life Ins. v. Crossley*, 580 N.E.2d 307, 308 (Ind.Ct. App.1991) (citing *American Underwriters Group v. Williamson*, 496 N.E.2d 807, 811

(Ind.Ct.App.1986)), once the third-party beneficiary has assented to the promise, sued upon it, or justifiably relied upon it, *see* RESTATEMENT (SECOND) OF CONTRACTS § 311(3) (1981); *accord Genentech, Inc. v. Regents of the University of California*, 952 F.Supp. 617, 619–20 (S.D.Ind.1996). In these cases, the various courts were asked to determine whether a contractual promise was intended to benefit a third party. The cases, therefore, deal with the issue as an all or nothing proposition. Yet, logic dictates this need not be the case. Contracts frequently have dozens, hundreds, sometimes thousands of promises contained within its four corners, and the parties may intend that only a handful inure to the benefit of a third party. The Employment Agreements are variations upon the third-party beneficiary theme. In paragraph 1.1(b) of the Employment Agreements, for example, it is provided that "the Orthodontist shall not compete with [Defendant] or act in any manner inconsistent with the best interests of [Defendant]." (Pl.Compl. at Ex. B.) This is clearly a promise, made by the Orthodontist-party inuring to the benefit of a nonparty, the Defendant. Defendant is a third-party beneficiary with respect to those promises (and *only those promises*) intended to benefit the Defendant. For these promises, the contracting parties (Plaintiff and the Orthodontist) may only amend or expunge such promises if Defendant has not yet taken a course of action prescribed in the Restatement (Second) of Contracts. The record presently before the court is insufficient to determine whether Defendant engaged in a course of conduct that operated to foreclose Plaintiff's right to amend the third-party promises. Summary judgment on this issue is therefore inappropriate.[8]

8. Promises for which Defendant is not a third-party beneficiary, the parties are free to modify the Employment Agreement in any manner consistent with its terms and Indiana law. Summary judgment is appropriate on this issue.

### C. Fraud–in–the–Inducement Counterclaim

Last, Plaintiff moves to dismiss Defendant's fraud-in-the-inducement counterclaim on the grounds it fails to meet the heightened pleading requirements of FED. R.CIV.P. 9(b) ("In all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity."). Magistrate Judge Rodovich granted Defendant's "Motion for Leave to Amend" in order to state its claim for fraud in greater detail, rendering moot this motion to dismiss.

For the foregoing reasons, the court **GRANTS** summary judgment to Defendant on Count I of Plaintiff's Complaint, and **DENIES** summary judgment to Plaintiff on Count I. With regard to Count II of the Complaint, summary judgment is **GRANTED IN PART** and **DENIED IN PART**. Plaintiff's motion to dismiss Defendant's counterclaim is **MOOT**.

**IT IS HEREBY ORDERED, DECREED, AND ADJUDGED THAT** Plaintiff has the right to amend the Employment Agreements executed on November 1, 1996 with the written consent of its doctor-employees as long as Defendant is not a third-party beneficiary to the promises affected by the proposed amendment.

**SO ORDERED.**