**T. Barry CLOWER, D.M.D., PC., and T. Barry Clower, Plaintiffs,**

v.

**ORTHALLIANCE, INC., Defendant.**

No. CIV.A. 1:01–CV–1636–JOF.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 24, 2004.

Jefferson M. Allen, McGuire Woods, Atlanta, GA.

James Joseph Brissette, McGee & Oxford, Atlanta, GA.

Scott M. Clearman, McClanahan & Clearman, Houston, TX.

Brian A. Colao, Locke Liddell & Sapp, Dallas, TX.

Robert H. Espey, McClanahan & Clearman, Houston, TX.

Andrew J. Hinton, Hinton & Powell, Atlanta, GA.

Timothy Harold Kratz, McGuireWoods, Atlanta, GA.

Christopher M. LaVigne, Locke Liddell & Sapp, Dallas, TX.

Randy J. McClanahan, McClanahan & Clearman, Houston, TX.

Michael D. Myers, McClanahan & Clearman, Houston, TX.

## ORDER

FORRESTER, Senior District Judge.

This matter is before the court on Defendant's motion for partial summary judgment [85–1], Plaintiffs' motion for partial summary judgment [86–1], Defendant's motion for leave to file a response to claims of illegality [97–1], and Plaintiffs' motion for leave to file supplemental authority [109–1].

## I. Statement of the Case

### A. Procedural History

Plaintiffs, T. Barry Clower, D.M.D., and T. Barry Clower, D.M.D., P.C. ("PC"), filed suit against Defendant Orthalliance, Inc., in the Superior Court of Fulton County, alleging breach of contract and fraud. Defendant removed this case to federal court on June 22, 2001 and filed a motion to dismiss the claim of fraud on June 29, 2001. On February 27, 2002, this court granted Defendant's motion to dismiss the fraud claim unless Plaintiffs amended their complaint to cure the defect within twenty days. Plaintiffs duly submitted a more detailed claim of fraud, and Defendant filed its second motion to dismiss, which this court granted on March 25, 2003. A conference pursuant to Rule 16 of the Federal Rules of Civil Procedure was held on May 28, 2003. In addition to disposing of discovery disputes, the court also granted leave to the parties to amend the complaint and counterclaim, respectively. Plaintiffs filed their amended complaint on June 9, 2003, and Defendant its counterclaim on June 30, 2003. At the close of discovery, on December 1, 2003, both parties filed partial motions for summary judgment.[1] Further pending before this court are Defendant's motion for leave to file a response to Plaintiffs' claims of illegality, raised in Plaintiffs' motions, and Plaintiffs' motion for leave to file supplemental authority in support of its motion for partial summary judgment.

### B. Facts

Plaintiff Clower, a Georgia orthodontist, along with his wholly-owned professional corporation,[2] entered into an arrangement

---

1. The court had great difficulty construing Defendant's motion for partial summary judgment. In its motion, Defendant sought summary judgment of a claim which was not pled in Plaintiffs' amended complaint, and in general failed to connect its own arguments to a particular claim in the complaint. Throughout this order, the court has discussed Defendant's position as best as it could be interpreted.

2. Like the instant Plaintiff PC, this first professional corporation was also called T. Barry Clower D.M.D., P.C. Upon execution of the Agreement and Plan of Reorganization, this first P.C. was merged into Defendant. Plaintiff Clower later established a second corporation, Shannon Dental Clinic, which was also a wholly-owned professional corporation. Shannon was later renamed T. Barry Clower D.M.D., P.C. The Plaintiff in this case is the second of the two corporations to carry the same name.

with Defendant, a practice management company, in which Defendant was to handle all financial and administrative affairs for the orthodontics practice and leave Dr. Clower free to focus on orthodontics. To that end, on or about August 26, 1997, Plaintiffs and Defendant entered into the three separate contracts that served to structure this cooperative relationship. In the first of the agreements, the Agreement and Plan of Reorganization (the "Plan"), Defendant contracted with Plaintiff Clower and his professional corporation to set up the bifurcated business arrangement. In return for a payment of cash and stock in Defendant corporation totaling $1,575,509.00, Plaintiff's professional corporation merged into Defendant and thereby transferred the great majority of the practice's tangible assets, including lease interests and orthodontic equipment, to Defendant. Plaintiff Clower simultaneously created a new corporate entity, Plaintiff PC, which entered into a Service Agreement with Defendant. The Service Agreement established the terms of the relationship between Defendant and the orthodontic practice. Defendant leased the assets of the practice back to Plaintiff PC, and agreed to provide business management and administrative services, in return for specified fees payable out of the practice's revenues. Finally, Plaintiff PC entered into a five-year employment agreement with Plaintiff Clower. It is through Plaintiff PC, and not through Defendant, that Plaintiff Clower provides orthodontic care.

Section I of the Service Agreement specifies Defendant's obligations to Plaintiffs. The Service Agreement covers Defendant's obligations as to facilities and equipment, personnel and payroll, business systems and procedures, information systems, accounting, legal services, marketing, financial services, fund management, and record keeping. In return for these services, the Service Agreement obligates Plaintiff PC to employ orthodontists to provide patient care, enter into an Employment Agreement with all employee and stockholder orthodontists, and keep confidential all trade secrets communicated by Defendant. Defendant is allowed to claim seventeen percent of the orthodontic practice's adjusted gross revenue as its service fee, and was also tasked with the responsibility for paying all practice expenses out of those revenues. Once all obligations are thus settled, Defendant is to return all remaining revenues to Plaintiff PC. The Service Agreement also provides a termination mechanism through which Plaintiffs may notify Defendant of an alleged breach of its obligations under the Service Agreement. Under § 5.2(b), Plaintiff is required to inform Defendant of its alleged material default, provide specific details of that default, and allow Defendant ninety days to cure the default.

The Service Agreement also discusses the exercise of control over the orthodontic practice. The Service Agreement recites in general terms that it is the orthodontic entity that will provide all orthodontic and patient care, and subsequent passages of the Service Agreement shape the contours of Plaintiff PC's control. While specifying Defendant's responsibilities, the Service Agreement states in § 1.1 that Plaintiff PC "shall retain control over all aspects of and decisions directly affecting the course of treatment of any patients." Similarly, §§ 1.2, 1.3, and 1.4 provide that Plaintiff PC maintains complete control over those aspects of facilities and equipment, and personnel and payroll, which affect patient care, and provide that Defendant will only establish business systems and procedures for operating the practice after consultation with Plaintiffs. The Service Agreement places the responsibility for employment of persons rendering patient care on Plaintiff PC, except that termination of an orthodontist other than for cause must be

approved by a majority of Defendant's Board of Advisors. Section 6.1 of the Service Agreement gives Plaintiff PC control over all professional services and provides that Defendant has neither the authority nor the ability to perform any orthodontic functions. Further, § 6.4 provides that no part of the Service Agreement is intended to or will be interpreted to interfere with Plaintiffs' ability to exercise independent professional judgment. Finally, § 7.5 of the Service Agreement states:

> To the extent any act or service required of [Defendant] in this Agreement should be construed or deemed, by any governmental authority, agency or court to constitute the practice of dentistry or orthodontics, the performance of said act or service by [Defendant] shall be deemed waived and forever unenforceable and the provision of Section 7.12 shall be applicable.

Section 7.12 provides that Defendant and Plaintiff PC will amend the Service Agreement if made necessary, among other reasons, by judicial decision.

As well as setting forth the framework for working relations between Plaintiffs and Defendant, the contracts also contain restrictive covenants. Section 2.9 of the Service Agreement contains a covenant not to compete between Defendant and Plaintiff PC, which provides as follows:

> During the term of this Agreement, the Orthodontic Entity, and any of its shareholders, agrees not to establish, develop or open any offices for the provision of orthodontic services within a ten (10) mile radius of any of the Centers covered by this Agreement (the "Area of Dominant Influence") without the express written consent of Orthalliance. For a period of two (2) years following the termination of this Agreement, the Orthodontic Entity and any of its shareholders shall be prohibited within the Area of Dominant Influence (i) from advertising in print (except for yellow page advertising and announcements for the opening of a practice) or electronic media of any kind, (ii) from soliciting in any manner patients, orthodontists or staff associated with the Centers, and (iii) from soliciting any referrals from any dentist who referred one or more patients to the Center within the three (3) years prior to the date of such termination. In the event the Orthodontic Entity terminates this Agreement pursuant to section 5.2(b), then this Section 2.9 shall be void and of no further effect; provided, however, the remainder of this Agreement shall remain in full force and effect.

Section 2.6 of the Service Agreement obligates Plaintiff PC to enter into such an Employment Agreement with all affiliated orthodontists as Plaintiff Clower was to sign contemporaneously with the signing of the Service Agreement. The restrictive covenant contained in § 5 of the Employment Agreement between Plaintiff PC and Plaintiff Clower provides as follows:

> For a period of two years following the termination of your employment, you may not (i) engage in any newspaper, print, radio, television, or electronic advertising for your orthodontic or dental services in the broadcast coverage area of television stations in the market area where the center covered by this agreement is located, without orthodontic entity's prior written consent, (ii) actively solicit or directly market your orthodontic or dental services (or those of any other orthodontic entity with which you are affiliated or employed) to anyone who was your patient (or a patient of the orthodontic entity) during the term of this agreement, (iii) provide orthodontic or dental services to any patients within a ten (10) mile radius of any center(s)'s [sic], (iv) actively solicit the center's staff or patients, or (v) solicit referrals from

any dentist who referred one or more patients to orthodontist or the orthodontic entity within the two years prior to such termination.

At least as early as 1999, Plaintiffs maintained a Do Not List ("DNL") database of patients whose payments were not formally entered into office records nor included in the calculation of revenues. Instead of entering records of treatment and payment in the normal fashion, which would have alerted Defendant to their existence, Plaintiffs maintained the records of these selected patients on separate ledger cards. The express purpose of withholding these patients, and their payments, from the normal record-keeping systems was to create a cash revenue stream for Plaintiffs. As Defendant calculated its service fees based upon the practice's reported adjusted gross revenues, the withholding of DNL patients resulted in Defendant not receiving the full amount of service fees to which it was entitled under the terms of the contract. Over the course of the DNL program's existence, at least $49,117.25 in total patient revenues were withheld. This resulted in an approximate $8,300.00 underpayment of service fees. Over the life of the contract, more than $1,000,000.00 in service fees were paid to Defendant.

Plaintiffs obtained several promissory notes from Defendant during their working relationship. Between August 1997 and May 2001, Defendant lent Plaintiff PC, at Plaintiff Clower's request, $355,460.71 in the form of promissory notes with Plaintiff Clower serving as personal guarantor on three of the four notes. As of June 21, 2003, Plaintiff Clower had not paid the outstanding balance of $217,192,94.

On March 6, 2000, Plaintiff Clower sent a letter through his attorney to Sam Westover, Defendant's CEO. In his letter, Plaintiff Clower expressed his disappointment in the performance and value of Defendant's stock, which had formed a significant percentage of Plaintiff Clower's consideration to enter the business arrangement with Defendant. Plaintiff Clower indicated that a combination of personal events such as medical bills and a death in the family, as well as the declining value of Defendant's stock, had created serious financial difficulties for Plaintiff Clower. Subsequently, on October 27, 2000, Plaintiff Clower sent a second letter to Mr. Westover notifying Defendant that Plaintiffs considered Defendant in breach of its contractual obligations. Mr. Westover responded to Plaintiff Clower's letter on November 5, 2000, denying the allegation of material default. Subsequently, Defendant's representatives attempted to discuss the alleged default with Plaintiff Clower in an attempt to address Clower's concerns, but Clower never spoke to these representatives. Plaintiffs stopped paying Defendant its service fees in May 2001.

## C. Contentions

Plaintiffs contend that the contractual relationship with Defendant is illegal, as the arrangement allows Defendant to practice dentistry against the laws of Georgia. Moreover, Plaintiffs contend that Defendant was the first to materially breach the contracts by failing to perform its obligations under the Service Agreement. Plaintiffs contend that Defendant never fully performed its obligations under the Service Agreement. Further, Plaintiffs contend that the creation of the DNL and related failure fully to report income to Defendant was not a material default of its contractual obligations to Defendant. Plaintiffs further contend that the restrictive covenants contained in the contracts are void and unenforceable under state law. Finally, Plaintiffs contend that the promissory notes, extended by Defendant

to Plaintiffs as part of the illegal relationship, are tainted with the same illegality. Plaintiffs further contend that the notes were executed as part of Defendant's responsibility under the Service Agreement to aid in expansion of the practice, and Defendant's breach of the Service Agreement excuses Plaintiffs' obligation to pay the amounts due and owing under the notes.

As an initial matter, Defendant denies that the result of the three contractual agreements is Defendant's unauthorized and illegal practice of dentistry. Moreover, Defendant disputes the allegation that it was the first to breach the contracts and contends that Plaintiffs were in fact the first to breach, as the creation of the DNL resulted in underpayment of the required service fees. Further, even if Defendant was the first to breach the contracts, it contends that Plaintiffs did not provide proper notice and opportunity to cure under § 5.2 of the Service Agreement. Defendant contends that the restrictive covenants found in the several contracts are valid and enforceable, and further argues that Plaintiffs' obligations under the four promissory notes are also enforceable. Finally, Defendant contends that Plaintiffs are not entitled to the measure of damages they seek for two reasons: (1) Plaintiffs cannot properly ask for the refund of all of their price of performance under the contract, and (2) Plaintiffs cannot seek repayment of voluntary payments.

## II. Discussion

### A. Illegality[3]

Georgia statute forbids the practice of dentistry without a license. O.C.G.A. § 43–1–49 (2002). Moreover, no "person, firm, partnership, corporation, or other entity" may practice dentistry under another's license. O.C.G.A. § 43–1–51. Plaintiffs contend that Defendant's control over the assets and personnel of the orthodontics practice was so extensive that implicitly Defendant was engaged in the practice of dentistry under the name and license of Plaintiff Clower. Plaintiffs acknowledge that Defendant does not outright own any part of Plaintiff PC or have a direct employment relationship with Plaintiff Clower. Nevertheless, Plaintiffs contend that Defendant's control over the business affairs of the orthodontics practice, particularly over the gross receipts of the practice, allow it to control both Plaintiff PC and Plaintiff Clower.

Similar litigation between Orthalliance and affiliated orthodontics practices has occurred in other districts nationwide, several of which have raised this same question of illegality. The various orders of the federal district courts presiding over the claims do not fall into one clear pattern; instead the decisions are all highly dependent on the specific state laws in question. *See Penny v. Orthalliance*, 255 F.Supp.2d 579, 581 (N.D.Tex.2003) (finding the contracts to be illegal); *Orthodontic Affiliates, P.C. v. OrthAlliance, Inc.*, 210 F.Supp.2d 1054, 1058 (N.D.Ind.2002) (upholding contracts against claim of illegality). In Georgia, the practice of dentistry is defined as examining or performing operations on the human oral cavity or associated structures, tooth extraction, crown filling, repairing appliances used on teeth, undertaking a physical examination of a patient in an office or other such proper place for provision of dental services, diagnosing dental radiographs, or holding one-

---

**3.** The court DENIES Defendant's untimely filing of a response to Plaintiffs' motion of illegality [97–1]. The court has reached its own opinion as to the corporate practice of dentistry without consulting Defendant's proffered materials. The court GRANTS Plaintiffs' motion to file supplemental authority [109–1].

self out as willing to do any of these things. O.C.G.A. § 43–11–17.[4] No one contends that Defendant actually performed any dental service. Nevertheless, Georgia has formally prohibited corporations from employing such licensed practitioners as orthodontists under a corporate practice of medicine, or dentistry, doctrine. O.C.G.A. § 43–34–37 (1980); *Pearle Optical of Monroeville, Inc. v. Georgia State Bd. of Examiners*, 219 Ga. 364, 375–76, 133 S.E.2d 374 (1963) (discussing the prohibition against corporate employment of an ophthalmologist which the court defined, like a dentist or doctor, to be a "learned profession").[5] Thus, if the three contracts binding Plaintiffs and Defendant together can be construed as Defendant's employment of Plaintiff Clower, then the various contracts could be illegal under that doctrine.

■ Far from representing Defendant's employment of Plaintiff Clower, the contracts between the parties, particularly the Service Agreement between Defendant and Plaintiff PC, clearly set forth an intent that Plaintiffs have full control over all aspects of orthodontic and other patient care. In the opening recital to the Service Agreement, the parties affirmed their intent that Plaintiff PC and its employees perform all patient care. In specifying the duties and obligations to the parties in more specific terms, the Service Agree-

ment repeatedly provides that Plaintiff PC be in exclusive control of all orthodontic care, from selection of equipment to employment of orthodontists and hygienists. Plaintiff PC has the power to fire its orthodontic staff for cause; the only restriction on its power to terminate employment would be in those instances in which the termination would be without cause. Moreover, in § 6.4 of the Service Agreement, within the section entitled "Independent Contractor," the parties agree that no provision of the Service Agreement is to interfere with an orthodontist's ability to "independently exercise professional and ethical judgment in the performance of his patient care responsibilities." Finally, in §§ 7.5 and 7.12 the parties contracted to amend the Service Agreement and its apportionment of responsibilities if a court, or some other agency, ever construed any act of Defendant as constituting the practice of dentistry or orthodontics. Thus, the terms of the contract governing the relationship between the parties make it very clear that Defendant did not intend, and in fact did not, employ Plaintiffs to carry out its own corporate practice of orthodontics. Accordingly, Georgia case law counsels this court not to void this contract for illegality.[6] As the contracts must be considered legal, the court must now focus its attention on the central dis-

4. Georgia further defines dentistry to be "the evaluation, diagnosis, prevention, or treatment, or any combination thereof, whether using surgical or nonsurgical procedures, of diseases, disorders, or conditions, or any combination thereof, of the oral cavity, maxillofacial area, or the adjacent and associated structures, or any combination thereof, and their impact on the human body provided by a dentist, within the scope of his or her education, training, and experience, in accordance with the ethics of the profession and applicable law, including, but not limited to, the acts specified in Code Section 43–11–17. O.C.G.A. § 43–11–1.

5. The court notes that the continued health of the corporate practice of medicine in general is in doubt. *See* Adam M. Friedman, Comment, *The Abandonment of the Antiquated Corporate Practice of Medicine Doctrine: Injecting a Dose of Efficiency into the Modern Health Care Environment*, 47 Emory L.J. 697, 726–27 (Spring 1998).

6. In so holding, the court has shown that Plaintiffs cannot pursue their claim for declaratory judgment as to the practice of dentistry, count II of Plaintiffs' Amended Complaint.

pute in the present case: breach of contract.

## B. Defendant's Breach of Contract: Election

Plaintiffs contend that Defendant materially breached the contract by failing to provide any of the services contemplated by the agreement. Plaintiffs contend that the Service Agreement obligated Defendant actually to take over the management of the business affairs of the practice. In merely providing various options and choices to Plaintiffs for Plaintiffs to implement and forcing Plaintiffs affirmatively to ask for service, Defendant allegedly violated its obligations. Defendant rejects this argument and contends that it provided all of the services agreed to under the terms of the contract.

 Assuming Plaintiffs are correct in their contention that Defendant breached the terms of the Service Agreement, the court nevertheless finds that Plaintiffs may not maintain a claim for breach of contract against Defendant. The entire thrust of Plaintiffs' argument is that Defendant has never fully performed its obligations under the contracts. Plaintiffs do not contend that Defendant once fully performed its duties to provide management services and then the quality of its services later began to slip, but rather argue that Defendant's performance was not in substantial compliance with its contractual obligations from the outset of the parties' agreement. Thus, Defendant was breaching its contract with Plaintiffs in 1997, 1998, and 1999 in exactly the same manner of which Plaintiffs complained in its October 27, 2000 letter. A party's right to pursue remedies for breach must be asserted promptly. *See Crawford v. Etheridge,* 248 Ga.App. 429, 432, 546 S.E.2d 551 (2001). At the point of breach, a party may continue the contract or refuse to perform. *Southern Sav. Bank v. Dickey,*

58 Ga.App. 718, 722, 199 S.E. 546 (1938); 13 Williston on Contracts § 39.32 (4th ed.2003). If the breach is material, the non-breaching party must choose one of two inconsistent rights; they may either allege a total breach, terminate the contract and bring suit, or honor the contract, declare the default only a partial breach, and recover those damages caused by that partial breach. Williston, *supra* at § 39.32. When a party knows a contract has been breached and continues to perform or accept performance under the contract, that party can be said to have made an election. *Dickey,* 58 Ga.App. at 722, 199 S.E. 546 (1938); *Luke v. McGuire Ins. Agency of Georgia, Inc.,* 133 Ga.App. 948, 953, 212 S.E.2d 889 (1975); Williston, *supra* at § 39:32. In opting to continue the contract and receive benefits under that contract, the non-breaching party has ended its right to refuse to perform his part of the contract. *Id.; Nguyen v. Talisman Roswell LLC,* 262 Ga.App. 480, 483, 585 S.E.2d 911 (2003).

In *Luke v. McGuire Insurance Agency of Georgia, Inc.,* 133 Ga.App. 948, 948, 212 S.E.2d 889 (1975), an employee was party to a compensation agreement in which he received a salary plus two percent of his commissions. Within a few months, however, the company had moved to a new compensation plan in which employees would receive a salary plus five percent of the net profits of their office. *Id.* at 948–49, 212 S.E.2d 889. The employee was paid under the new compensation plan for three years. *Id.* at 949, 212 S.E.2d 889. At trial, the employee sought compensation under the first salary plan and alleged that he had never agreed to the second compensation plan. *Id.* Where "the petition discloses that the defendant violated and changed the terms of the contract, and the plaintiff elected to accept the breach and abide by the changes by continuing to perform services thereunder and receive

the benefits therefrom . . ., without objection or protest, he cannot then, upon terminating his services with the defendant, maintain a suit for benefits which he claims accrued to him under the original contract but after the alleged breach and changes in the contract occurred." *Id.* at 953, 212 S.E.2d 889 (citing *Southern Savings Bank v. Dickey*, 58 Ga.App. 718, 723, 199 S.E. 546 (1938)). *See also Nguyen v. Talisman Roswell, LLC*, 262 Ga.App. 480, 585 S.E.2d 911 (2003) (finding that when a party to a lease contract continued the contract and failed to object despite knowing that the other party had not provided a property of the dimensions specified in the contract, the right to object to the nonperformance was lost).

■ As in *Luke*, Plaintiffs allegedly received benefits under the contract which were different than the benefits for which they bargained. Similarly, Plaintiffs continued to accept those different benefits without objecting to the alleged breach. At the point in which Plaintiffs realized that Defendant had breached its obligations under the Service Agreement, Plaintiffs possessed the right to elect one of two remedies: immediate termination of the contract, or continuing the contract and seeking partial damages for the breach. In electing to continue perform-

ance under the contract, Plaintiffs thereby lost the opportunity to maintain a suit for the benefits owed to it under their understanding of the original contract. *Luke*, 133 Ga.App. at 953, 212 S.E.2d 889. Of course, Plaintiffs could have provided the proper notice to Defendant of material breach, immediately terminated the contract and brought suit for the breach. That option, however, was not elected by Plaintiffs, and Plaintiffs cannot now have the benefits of the unelected remedy. Accordingly, the court finds that Plaintiffs' performance of their obligations under the contract after the breach was discovered prevents Plaintiffs from now raising a claim for material breach of contract. Thus, the court cannot find, as Plaintiffs have asked, that Defendant first materially breached the contract, thus excusing Plaintiffs' non-performance. Accordingly, the court must deny Plaintiffs' motion for summary judgment as to that claim.[7],[8]

## C. Plaintiffs' Breach of Contract: Materiality

Defendants have moved for summary judgment on their own breach of contract claim, alleging that Plaintiffs materially breached their contractual obligations by operating the DNL program, in which pa-

---

7. As this court finds that Plaintiffs cannot sue Defendant for breach of the Service Agreement, so, too, must the court find that Plaintiffs may not maintain a claim for breach of good, faith and fair dealing. In Plaintiffs' Amended Complaint, Plaintiffs state that Defendant has breached its duty of good faith and fair dealing by failing to honor its obligations under the Service Agreement. The court does not find that this raises a tort claim separate from the instant claim for breach of contract. *See Orkin Exterminating Co. v. Stevens*, 130 Ga.App. 363, 365, 203 S.E.2d 587 (1973) (holding that a party may raise both a breach of contract and tort claim from a single act so long as that act violates a duty to the plaintiff independent of the contract). Similarly, because the court finds that

Plaintiffs cannot bring suit for damages arising from breach of contract, the court finds that it cannot grant Plaintiffs' claim for an accounting of those damages. Moreover, the court does not see where Plaintiffs have alleged facts to show that such an equitable remedy is warranted. *Cf. Hirsch v. Equilateral Associates*, 245 Ga. 373, 378–79, 264 S.E.2d 885 (1980) (finding that an accounting was not warranted to determine gains and losses in a partnership where partners engaged in transactions to acquire net losses for tax purposes).

8. The court notes that it need not and did not consider the deposition of Ms. Mehlman. The appropriateness of her deposition was a point of contention between the parties.

tient transactions were not reported within Defendant's system but rather maintained on separate ledger cards. As a consequence of the program, payments obtained from DNL patients were not deposited in the practice's bank account, which was managed by Defendant. Defendant collected its service fee as a percentage of the revenues deposited in the practice account. Consequently, over the life of the program, approximately $49,117.25 in revenue was not reported to Defendant, resulting in an approximate $8,300.00 underpayment of service fees. Plaintiffs acknowledge this breach of their obligations under the contract but contend that such breach is not material in nature.

▇▇▇ While any diversion from contractual obligations may be considered a breach, a material breach only occurs when the failure to perform is so fundamental it goes to the root or essence of the contract and defeats its central purpose. *See Lager's LLC v. Palace Laundry, Inc.,* 247 Ga.App. 260, 263, 543 S.E.2d 773 (2000); 13 Williston on Contracts § 63.3 (4th ed.2003). In *Lager's,* plaintiff Palace Laundry was a business enterprise which rented and laundered linens. *Id.* at 261, 543 S.E.2d 773. Among its clients was defendant Lager's, a bar and grill. *Id.* Citing service issues and the quality of the linens supplied, defendant Lager's quickly sought to terminate the contract. *Id.* The Georgia Court of Appeals, however, found that Palace Laundry had not materially breached the contract, noting that Lager's was able to use the linens provided and the restaurant's operations were not impeded. *Id.* at 263, 543 S.E.2d 773. Thus, although the provision of linens went to the heart of the contract, because the breach did not entirely frustrate the purposes of the nonbreaching party, the breach was not considered material. In comparing the facts of the instant case to *Lager's,* this court must also find that the breach at issue is not material. Although payment of service

fees does go to the heart of the parties' agreement, the court must recognize that Defendants only lost $8,000 out of a revenue stream that totaled more than $1,000,000 over the life of the contract. The court is not endorsing any definition of materiality that depends on the quantity and not quality of breach. Nevertheless, the court cannot escape the conclusion that even with the loss of the $8,000, the underlying purpose of the contract was not thwarted. Defendant was able to perform, or at least partially perform in its accustomed manner, the management services required under the agreement, and Defendant received sufficient funds to pay its expenses and earn a profit. Accordingly, the court finds that while Plaintiffs' DNL program constitutes a breach of the contract, this breach is not material.

▇▇▇ Nonetheless, while the breach was not material, a cause of action for partial breach still lies. Whenever a party to a contract fails to perform his duties, without a valid excuse, he is liable for breach of contract. *Finch v. Illinois Community College Bd.,* 315 Ill.App.3d 831, 836, 248 Ill.Dec. 398, 734 N.E.2d 106 (2000); Restatement (Second) of Contracts, §§ 231–60. The remedies for that breach, however, depend on the magnitude of the breach. *Id.* A minor breach of the contract is compensable in damages; a material breach will excuse the nonbreaching party from its duty of performance. *Id.* As we have found that Plaintiffs' failure to report DNL amounts and fully perform their duty to pay service fees did not constitute a material breach of the contract, Defendant is only entitled to damages. The parties agree that Defendant lost approximately $8,300.00 in fees it would have otherwise been paid absent the DNL program. Accordingly, the court finds that Defendant, because of Plaintiffs' partial breach of the contract, is owed

damages in the amount of service fees not received. Defendant has alleged, and Plaintiff has not disputed, that it underpaid $49,117.25 in revenues. Defendant thus did not receive its percentage of these revenues as its service fee. While it appears that the amount of damages can be reduced to a sum certain, the parties have thus far only informed the court that the lost service fee is approximately $8,300.00. Such an approximation does not represent a statement of liquidated damages. Thus, the court will GRANT Defendant's claim for breach of contract in its motion for summary judgment. Defendant is directed to file its calculation of damages within ten (10) days of the date of entry of this order.

### D. Covenants

Plaintiffs have asked this court to rule as a matter of law on their claim for a declaration that the covenants not to compete contained in the Service Agreement and Plaintiff Clower's Employment Agreement with Plaintiff PC are void and unenforceable. The state of Georgia is generally concerned with the reasonableness of a covenant not to compete ancillary to any contract, but greater latitude will be allowed to covenants related to the sale of a business than to those covenants related to employment. *Watkins v. Avnet, Inc.*, 122 Ga.App. 474, 476, 177 S.E.2d 582 (1970).

### 1. Service Agreement

■■■■■ The court will first take the covenant not to compete which is ancillary to the parties' agreement to sell the tangible assets of the business, which this court will construe as analogous to the sale of a business.[9] When a party sells his busi-

ness, part of his compensation includes the sale of any good will bound up in his business. *Redmond v. Royal Ford, Inc.*, 244 Ga. 711, 714, 261 S.E.2d 585 (1979). Accordingly, a court will allow the purchaser of a going concern to condition his purchase on the execution of a covenant not to compete. *See id* at 713, 261 S.E.2d 585. When analyzing a covenant ancillary to the sale of a business, a court will examine the reasonableness of the territorial effect. *Jenkins v. Jenkins Irrigation, Inc.*, 244 Ga. 95, 99, 101, 259 S.E.2d 47 (1979). Further, the reasonableness of any such covenant not to compete will be judged on whether the restrictions are designed to protect the legitimate business interests of the purchaser, which are comprised of the business's value and good will. *Hudgins v. Amerimax Fabricated Products, Inc.*, 250 Ga.App. 283, 286, 551 S.E.2d 393 (2001). A court may "blue-pencil" the covenant to make an offending covenant term reasonable, although it cannot actually reform a covenant that is void for vagueness. *Hamrick v. Kelley*, 260 Ga. 307, 308, 392 S.E.2d 518 (1990).

The covenants in the Service Agreement prohibit Plaintiff PC from soliciting Defendant's clients, soliciting referrals from any dentist who previously referred patients to Defendant, advertising its new practice, or operating a practice. In full, the covenant provides:

> During the term of this Agreement, the Orthodontic Entity, and any of its shareholders, agrees not to establish, develop or open any offices for the provision of orthodontic services within a ten (10) mile radius of any of the Centers covered by this Agreement (the "Area of

---

**9.** Although the contract denominates the relationship between Plaintiff PC and Defendant as that of independent contractors, the court finds that the sale of much of the practice's tangible assets to Defendant makes the instant transaction more akin to the sale of a busi-

ness. *See Amstell, Inc. v. Bunge Corp.*, 213 Ga.App. 115, 116, 443 S.E.2d 706 (1994) (finding a contract not in the nature of a sale of a business when no assets, stock, or good will were sold).

Dominant Influence") without the express written consent of Orthalliance. For a period of two (2) years following the termination of this Agreement, the Orthodontic Entity and any of its shareholders shall be prohibited within the Area of Dominant Influence (i) from advertising in print (except for yellow page advertising and announcements for the opening of a practice) or electronic media of any kind, (ii) from soliciting in any manner patients, orthodontists or staff associated with the Centers, and (iii) from soliciting any referrals from any dentist who referred one or more patients to the Center within the three (3) years prior to the date of such termination. In the event the Orthodontic Entity terminates this Agreement pursuant to section 5.2(b), then this Section 2.9 shall be void and of no further effect; provided, however, the remainder of this Agreement shall remain in full force and effect.

In *Hicks v. Doors by Mike, Inc.*, 260 Ga.App. 407, 408, 579 S.E.2d 833 (2003), the owners of a residential gutter business sold their business, and simultaneously executed a non-competition and non-solicitation agreement. The sellers agreed that they would not, in any fashion, compete with their former business for five years and within a fifty mile radius. *Id.* The sellers also promised not to solicit business from customers or prospective customers of their former company with whom they had contact while owners and employees. *Id.* In analyzing the non-compete agreement, the Georgia Court of Appeals found that the fifty mile radius was reasonable, when the business itself covered an area within a 100–mile radius of Conyers, Georgia. *Id.* at 410, 579 S.E.2d 833.

In the instant case, the burden is upon Plaintiffs to show the non-competition agreement is unreasonable. Plaintiffs do not expend any time in presenting first-hand arguments to this court; instead, Plaintiffs ask this court to adopt wholesale the reasoning of Judge Martin's April 23, 2004 order in *Smith v. Orthalliance*, 1:01–cv–2778–BBM. In her order, when analyzing the Service Agreement covenant, Judge Martin did not address the reasonableness of the ten-mile territorial limits, but rather focused on the vagueness of the term "electronic media." *Id.* at 17. Believing that "electronic media" could embrace, for example, a California internet advertisement, the court found that the term was unreasonably vague. *Id.* Further, the court found that blue-penciling the covenant to remove the "electronic media" language would defeat the intent of the covenant to prohibit electronic advertising. *Id.* at 17–18. Noting that Georgia law does not allow a court to rewrite a covenant, Judge Martin found the covenant contained in the Service Agreement to be unenforceable. *Id.* at 18.

This court is not bound by the opinions of a sister court within this district. *Fishman & Tobin, Inc. v. Tropical Shipping & Const. Co., Ltd.*, 240 F.3d 956, 965 (11th Cir.2001) ("While the decisions of their fellow [district court] judges are persuasive, they are not binding authority."). This court finds that the advertising clause, including the electronic media phrase, are all modified by the phrase "within the Area of Dominant Influence," which is the ten-mile radius around an orthodontic center. The court construes this contractual language to mean that Plaintiffs are prohibited from advertising, in print or electronic form, in the given territory. Moreover, given that a ten-mile radius is significantly smaller in scope than the fifty-mile radius seen in *Hicks*, the court finds that the territorial effect of the instant agreement is reasonable. Finally, as an agreement need not be limited as to time when the territorial effect is reason-

able, the court finds that the two-year time period is reasonable. *Id.*

▮ This court must also examine whether these covenants are reasonably designed to protect the company's value and goodwill. Plaintiffs contend that the covenants are designed to prohibit him from practicing orthodontics, but as Defendant's business is management and not an orthodontic practice, these covenants are not reasonably designed to protect the value of a management business. In selling the bulk of the practice's tangible assets to Defendant, Plaintiffs were essentially selling the right to manage a thriving orthodontic practice to Defendant. The value of such a right would be tangibly reduced if a competitor dental or orthodontic practice was established by Plaintiff within the same immediate area, as there would be less of a practice to manage. As noted by the *Hicks* court,

The vendor who signs a covenant not to compete when selling a business receives an equivalent for his partial abstention from that business, in the increased price paid him for it on account of his covenant. The covenant operates to his affirmative pecuniary benefit and against his impoverishment, in that, while being paid for desisting from the particular business in the locality covered by it, he may still enter upon other pursuits of gain in the same locality or upon this one in other localities.

*Id.* at 411, 579 S.E.2d 833 (quoting *Attaway v. Republic Svcs. of Georgia, LLP,* 253 Ga.App. 322, 324, 558 S.E.2d 846 (2002)). As the covenant is reasonable as to time, geographic area, and scope, the court finds this restrictive covenant to be valid.

### 2. Employment Agreement

▮ The court finds that the restrictive covenant contained in the Employment Agreement is also enforceable. The covenant in the Employment Agreement imposes similar obligations on Plaintiff Clower as the Service Agreement imposed upon Plaintiff PC.

For a period of two years following the termination of your employment, you may not (i) engage in any newspaper, print, radio, television, or electronic advertising for your orthodontic or dental services in the broadcast coverage area of television stations in the market area where the center covered by this agreement is located, without orthodontic entity's prior written consent, (ii) actively solicit or directly market your orthodontic or dental services (or those of any other orthodontic entity with which you are affiliated or employed) to anyone who was your patient (or a patient of the orthodontic entity) during the term of this agreement, (iii) provide orthodontic or dental services to any patients within a ten (10) mile radius of any center(s)'s [sic], (iv) actively solicit the center's staff or patients, or (v) solicit referrals from any dentist who referred one or more patients to orthodontist or the orthodontic entity within the two years prior to such termination.

Covenants not to compete ancillary to an employment agreement receive stricter scrutiny than those ancillary to the sale of a business. *Watkins v. Avnet, Inc.,* 122 Ga.App. 474, 476, 177 S.E.2d 582 (1970). This court, however, cannot ignore the fact that this employment agreement was signed as part of a larger agreement for the sale of the business. In fact, the agreement between Plaintiff PC and Defendant expressly required Plaintiff PC to enter into employment agreements with Plaintiff and any other orthodontists and thus formed part of the consideration for the bargain. Thus, the court looks behind the "Employment Agreement" title and finds the non-compete agreements contained in the employment agreements are

manifestly part of the sale of the business. Thus, the court will analyze these covenants in the same manner as those contained in the Service Agreement.[10]

Plaintiffs again reference the April 23, 2004 order of Judge Martin and urge this court to follow her reasoning in striking these covenants as unreasonable. Judge Martin held that the geographical limitation on advertising was unclear in the employment agreement covenant. *Id.* at 13. Specifically, Judge Martin noted that the terms "broadcast coverage area" and "market area" were undefined in the covenant. *Id.* Further, Judge Martin was concerned that the scope of these undefined areas was not determinable until the time of the employee's termination from employment. *Id.* at 14. Importantly, however, Judge Martin analyzed the Employment Agreement covenant under the stricter analysis permitted for covenants attached to an employment contract. *Id.* Thus, concluding that she could not blue-pencil a covenant ancillary to an employment contract, Judge Martin rejected the entire covenant as unreasonable. *Id.*

This court must agree that the terms "market area" and "broadcast coverage area" are vague. Georgia courts have routinely allowed covenants to prohibit competition within the area in which the employee was formerly employed. *See W.R. Grace & Co. v. Mouyal,* 262 Ga. 464, 467,

422 S.E.2d 529 (1992). While the "market area" in the instant contract may well be coterminous with the area from which the orthodontic practice draws its patients, however, there is no evidence in the record to demonstrate the truth of this supposition. The covenant provides no detail as to the contours of the market area, or any hint of what Defendant considers its market area to be. It is not clear, for example, whether the "market area" is a particular locality, the Atlanta area, or the state of Georgia. Moreover, the court is also concerned about the term "broadcast coverage area of television stations" within the market area. As this definition hinges on the vague definition of "market area," this limitation, too, lacks real meaning. However, "if the contract for the sale of a business and an employment contract are part of the same transaction, they may be construed together to supply missing elements and blue penciled to make overbroad terms valid." *Lyle v. Memar,* 259 Ga. 209, 210, 378 S.E.2d 465 (1989).

In *Drumheller v. Drumheller Bag & Supply, Inc.,* 204 Ga.App. 623, 626–27, 420 S.E.2d 331 (1992), the Georgia Court of Appeals construed together a contract for the sale of a business and an employment agreement containing a restrictive covenant, both entered into as part of a single transaction. As a consequence of reading these two agreements together, the *Drum-*

---

**10.** The court notes that although Defendant is not a party to the Employment Agreement between Plaintiff PC and Plaintiff Clower, Defendant is nevertheless a third-party beneficiary of such a contract. A third-party beneficiary contract is created when a promisor engages with a promisee to render performance to a third person. Further, it must appear to both parties that the third person is intended to be a beneficiary. *LDH Properties, Inc. v. Morgan Guaranty Trust Co. of New York,* 145 Ga.App. 132, 133–34, 243 S.E.2d 278 (1978). Section 2.6 of the Service Agreement obligates Plaintiff PC to enter into an employment agreement with Plaintiff Clower

and any other orthodontist under terms including the covenant not to compete. The section also states that both parties recognize that the purpose of such a promise is to allow Defendant to provide its services under the contract. Thus, both parties understood that Plaintiff PC was promising to enter into an employment agreement with Plaintiff PC, and this promise was for the benefit of Defendant. Accordingly, the court finds that Defendant is a third-party beneficiary. Nevertheless, for the reasons discussed above, Defendant may not enforce the Employment Agreement covenant not to compete.

*heller* court held that over-broad, indefinite, or vague terms would not invalidate the covenant but rather call for blue penciling to make its terms valid. *Id.* at 627, 420 S.E.2d 331. In *Drumheller,* specific language in the restrictive covenant was overly broad as to the nature of the business activity being protected; indeed, the language was so broad it could be considered as describing any business activity at all. *Id.* at 628, 420 S.E.2d 331. Other language within the contract, however, more narrowly described the type of business from which the employee was prohibited from working. *Id.* Accordingly, the state Court of Appeals remanded the case to the trial court so that the covenant could be blue penciled to encompass only the narrowed scope of business activity. *Id.*

The Service Agreement between Plaintiff PC and Defendant defines the area within a ten-mile radius of the orthodontic center as its "Area of Dominant Influence." Reading this together with the vague term "market area," the court finds that the ten-mile "Influence" radius supplies any missing element in the vague "market area" geographical limitation. Accordingly, the court will exercise its power to blue-pencil the restrictive covenant in the employment agreement to replace "market area" with the Area of Dominant Influence, as defined in the Service Agreement. The covenant's terms are to be interpreted in light of this change. This change also harmonizes the covenants contained in the Service Agreement and the Employment Agreement. For all these reasons, the court must DENY Plaintiffs' motion for summary judgment as to its covenant claims. The restrictive covenants are to be construed as discussed in this order.

### E. Promissory Notes

 Defendant has moved for summary judgment as to the enforceability of its four promissory notes to Plaintiff PC, three of which were personally guaranteed by Plaintiff Clower. Plaintiff Clower took out four promissory notes between December 1997 and June 1999 which have not been fully repaid. All notes are executed by Plaintiff PC, and are payable to Defendant. Plaintiffs do not contest the fact that four notes remain unpaid but argue that Defendant's claim to enforce is defeated by its own breach of the Service Agreement. A party seeking a right to judgment on a promissory note has made a prima facie case by producing the note and showing its execution. *Gouldstone v. Life Investors Ins. Co.,* 236 Ga. App. 813, 815, 514 S.E.2d 54 (1999). The burden then shifts to the party opposing judgment to produce defenses. *Id.* Plaintiffs contend that Defendant was obligated to help Plaintiffs expand and grow its practice under the Service Agreement, and that these moneys were advanced as a means of advancing that goal. Nevertheless, as the court discussed earlier, Plaintiffs may not bring a cause of action for breach of contract against Defendant, thus precluding use of this defense to enforcement.[11] As Plaintiffs have not raised a valid defense to judgment on the promissory notes, the court GRANTS Defendant's motion for summary judgment as to this claim.

### III. Conclusion

The court thus GRANTS Defendant's motion for summary judgment [85–1]. The court GRANTS Defendant's motion to deny Plaintiffs' claims for accounting, breach of good faith and fair dealing, and

---

11. Plaintiffs have also claimed that the illegality of the contracts taints the notes and precludes their enforcement against Plaintiffs. The court, however, has already dismissed this argument.

declaration regarding illegality, as well as Defendant's own claim for breach of the obligation to pay the promissory notes, and claim that Plaintiffs breached the contract through its DNL program. The court hereby AWARDS Defendant damages from this breach. Defendant is DIRECTED to submit its calculation of damages within ten (10) days of the date of entry of this order. Defendant's claim that Plaintiffs failed properly to terminate under § 5.2 of the Service Agreement is DENIED AS MOOT. The court also DENIES Plaintiffs' motion for summary judgment, [86–1]. The court DENIES Defendant's motion for leave to file a response to claims of illegality [97–1], and GRANTS Plaintiffs' motion for leave to file supplemental authority [109–1].

A review of the parties' pleadings shows that Defendant's claims for fraud and state RICO violations remain. Accordingly, the court directs the parties to file their pretrial order on the remaining claims within thirty (30) days of the date of entry of this order.