A92A1523. ROBERTS v. TIFTON MEDICAL CLINIC, P.C. et al.
(426 SE2d 188)

BEASLEY, Judge.

The Tifton Medical Clinic, P.C., and its physician-shareholders filed this complaint in equity to enjoin Don Roberts, M.D., from violating restrictive covenants contained in employment agreements executed by Roberts and all of the clinic's other physician-shareholders. Roberts appeals the trial court's denial of his motion to dismiss and its grant of plaintiffs' request for an interlocutory injunction.

*Jurisdiction*

This case was appealed to the Supreme Court, which, citing *Beauchamp v. Knight*, 261 Ga. 608 (409 SE2d 208) (1991), transferred the appeal to this court, "[i]nasmuch as appellant raises no substantive issue of equity in this appeal." But see *Glosser v. Powers*, 209 Ga. 149 (3) (71 SE2d 230) (1952); *Rakestraw v. Lanier*, 104 Ga. 188 (30 SE 735) (1898); 15 EGL Injunctions, 413 (1980 Rev.). Both actions of the court involve the question of whether the restriction in the contract is enforceable. If it is, the restriction neither blocks pursuit of the complaint nor precludes the grant of the equitable relief ordered.

*Facts*

The facts are not in material dispute.

In 1980, Roberts moved to Tifton and began working with the Tifton Medical Clinic, a professional corporation composed of physician-shareholders who operate a group practice for the delivery of medical services. All matters concerning management of the clinic are decided by a majority vote of the board of directors, and all physician-shareholders have an equal stock interest and one vote on the board. When appellant joined the clinic, it was also the practice of the clinic to pay all physician-shareholders an equal salary.

Roberts purchased shares in 1981 and became a member of the board. Shortly thereafter, he received training in the field of gastroenterology at the clinic's expense. At a cost in excess of $125,000, the clinic purchased specialized equipment for him to use. At Roberts' request, the clinic also recruited a gastroenterologist, paying a placement fee of $15,000 because of the substantial demand for such physicians. In 1987, after extensive negotiation and discussion, each of the physician-shareholders executed identical "employment agreements" with the clinic. They would not have agreed to the restrictions contained in these agreements, absent the execution of identical agreements by all other physician-shareholders.

In 1988 or 1989, Roberts became dissatisfied with the amount of compensation he was receiving and began to demand that he be paid

more than other physician-shareholders. As a result, in 1988 he was paid $5,000 more than other physician-shareholders in the form of a bonus. In 1989, his salary from the medical clinic was $325,000; in 1990 it was $315,000; and in 1991 it was $267,000. In each of these years, his salary was over $100,000 more than any other physician-shareholder.

In September 1991, Roberts was elected president of the clinic. At that time, he decided to terminate his employment. Without informing the other physicians, he began taking steps to form another practice. He went in the clinic after hours and printed its patient list from the clinic's computer. On Friday, February 14, 1992, he delivered a written notice terminating his employment as of the following Monday. He then mailed letters to physicians who had referred patients to him at the clinic and requested that they redirect their referrals to his individual practice. He also mailed letters to patients informing them of his new practice.

Plaintiffs contend that Roberts has violated paragraphs 13 (A) and 19 of his employment agreement.

Paragraph 13 (A) of the agreement, entitled "Termination of Agreement," provides: "A. The employee of the corporation may voluntarily elect to terminate this agreement at any time provided that the party so electing delivers to the other party six (6) months written notice of such termination."

Paragraph 19, entitled "Restriction on Practice," provides: "Should the employee elect to voluntarily terminate this agreement under the provisions of paragraph 13 (A) above, the employee agrees that he will not maintain a practice for the provision of medical services (nor enter the employ of any person or firm maintaining a practice for the provision of medical services) within a geographical area encompassing a 25 mile radius of any facility maintained by the corporation or Family Treatment Center, Inc. for the provision of medical services at the time of termination during a period of two (2) years from the date of termination of employee's employment with the corporation. Both parties to this agreement acknowledge that, as a result of the employee's affiliation with the corporation, he shall be exposed to certain operative procedures, information and patients, and that the utilization of such information and exposure in competition to the corporation would be harmful. The parties acknowledged that the restriction contained in this paragraph is reasonable with regards to both time and geographical area. . . ."

In their complaint, plaintiffs requested that the court issue a temporary restraining order, as well as interlocutory and permanent injunctive relief. Roberts filed a motion to dismiss, arguing that paragraph 19 of the parties' agreement is overbroad and unenforceable because unreasonable. The trial court denied the motion to dismiss and

issued an interlocutory injunction "enjoining and restraining [Roberts] from maintaining a practice for the provision of medical services and from entering the employ of any person or firm maintaining a practice for the provision of medical services within a geographical area encompassing a 25 mile radius of any facility maintained by Tifton Medical Clinic, P. C., Tifton, Ga., for the provision of medical services."

## Case law

"By both constitutional and legislative provision, Georgia prohibits contracts or agreements in general restraint of trade. [Cits.] Georgia courts have consistently held that the prohibition does not impose an absolute bar against every kind of restrictive agreement." *Howard Schultz &c. v. Broniec*, 239 Ga. 181, 183 (1) (236 SE2d 265) (1977). Under the traditional test in Georgia, a covenant not to compete ancillary to an employment contract has been held unenforceable on public policy grounds, unless it is strictly limited in time and territorial effect and is otherwise reasonable considering the business interest of the employer sought to be protected and the effect on the employee. Id.

Under this test, it has been held that a restrictive covenant — which prohibits an employee from accepting employment with a competitor of the employer "in any capacity," or from engaging in a business "similar to" the employer's business or a "related trade" — is unenforceable in that it imposes a greater limitation upon the employee than is necessary for the protection of the employer and does not specify with particularity the nature of the business activities in which the employee is forbidden to engage. See *Fields v. Rainbow Intl. Carpet Dyeing &c. Co.*, 259 Ga. 375 (380 SE2d 693) (1989); *Wilson v. Center Bros.*, 250 Ga. 156, 157 (296 SE2d 589) (1982); *Howard Schultz*, supra, 239 Ga. at 184 (2). But see *National Teen-Ager Co. v. Scarborough*, 254 Ga. 467, 469 (330 SE2d 711) (1985), discussed infra.

A lesser standard of judicial scrutiny has been applied to covenants not to compete ancillary to the sale of a business. See *Taylor Freezer Sales Co. v. Sweden Freezer Eastern Corp.*, 224 Ga. 160, 162 (1) (160 SE2d 356) (1968). "When a person sells a business and covenants not to compete in a certain territory, the buyer pays and the seller receives a part of the total purchase price as consideration for that covenant. The buyer frequently would not buy the business if the seller were free to begin competing immediately." *Jenkins v. Jenkins Irrigation*, 244 Ga. 95, 100 (259 SE2d 47) (1979). Consequently, in *Jenkins* the Supreme Court held that it would apply the "blue-pencil theory of severability," where the territorial restriction in a covenant ancillary to the sale of a business was too broad and thus

unreasonable, although in *Rita Personnel Svcs. v. Kot*, 229 Ga. 314 (191 SE2d 79) (1972), the Court had previously refused to "blue pencil" covenants not to compete ancillary to employment contracts.

Another category of covenants not to compete are those found in professional partnership agreements. Beginning with *Rakestraw v. Lanier*, supra, 104 Ga., and culminating in *Rash v. Toccoa Clinic Medical Assoc.*, 253 Ga. 322, 323 (1) (320 SE2d 170) (1984), an agreement by a physician, through a covenant in a partnership agreement, not to engage in the practice of medicine, within a reasonably defined territory for a reasonable period of time after leaving the partnership, has been held by the Supreme Court to be generally enforceable.

The Court in *Rakestraw*, however, did find a distinction between such covenants and covenants ancillary to the sale of a mercantile or other kind of business. "In the former class there should be a reasonable limit as to time, so as to prevent the contract from operating with unnecessary harshness against the person who is to abstain from practicing his profession at a time when his doing so could in no way benefit the other contracting party. In the latter class such limit is not essential to the validity of the contract, but the restraint may be indefinite." Id. at 189 (3). And in *Jenkins*, supra, 244 Ga. at 97-98, the Court later observed that covenants ancillary to professional partnership agreements had been treated like employee covenants ancillary to employment contracts.

However, in *Rash*, the Court found "obvious differences" between the two. Accord *Taylor*, supra, 224 Ga. at 163. In *Rash*, the defendant-physician, who was an obstetrician/gynecologist, argued that his covenant not to compete was unenforceable because the territorial limitation was not adequately circumscribed in accordance with the strictures contained in decisions such as *Singer v. Habif, Arogeti & Wynne, P.C.*, 250 Ga. 376 (297 SE2d 473) (1982). *Rash* found *Singer* distinguishable in that, inter alia, it did not deal with a medical partnership agreement.

The Court in *Rash* held that "[w]e are dealing here not with an employment contract but with a partnership agreement. Although it does not appear that the appellate courts of this state have . . . clearly distinguished between the two types of agreements, there are obvious differences. In a partnership agreement such as the one here, as opposed to an employment agreement, the consideration flows equally among the contracting parties. For example, when an employee agrees to subject himself to possible future restrictions, he does so in exchange for the opportunity to have the job. He really gets nothing other than the opportunity to work in exchange for giving up this aspect of his freedom. On the other hand, here a partner has not only restricted himself, but he has also exacted from each of the other contracting parties a like restriction. . . . In a similar case, the Su-

preme Court of Oregon upheld such a covenant, calling attention to the mutual benefits and burdens involved in such an agreement. [Cit.]

"The next distinction between employment agreements and partnership agreements is that it is generally true in the employer/employee relationship that the employee goes into a transaction such as this at a great bargaining disadvantage. Such would not be expected to be the case in a professional partnership arrangement, and it certainly was not the case here. [Cit.] Medical doctors are in demand. Medical doctors in the field of obstetrics and gynecology are certainly in demand. This is best evidenced by the fact that Toccoa Clinic Medical Associates paid a 'finders fee' in excess of $4,000 in connection with the location of Dr. Rash.

"Since the employee who agrees to the covenant may have done so from an inferior bargaining position, and since the covenant may seriously impair his ability to earn a living, the courts have traditionally given greater scrutiny to restrictive covenants within employment contracts, as opposed to such covenants contained in business sales agreements. In the present case, however, neither unequal bargaining status nor impaired ability to earn a living is present. Seen in this context, the covenant does not appear to be unreasonable." Id. at 325-326 (2).

In *Watson v. Waffle House*, 253 Ga. 671, 673 (2) (324 SE2d 175) (1985), the Court held that rather than apply the three-element test of duration, territorial coverage, and scope of activity as an "arbitrary rule," it would utilize it as "a helpful tool in examining the reasonableness of the particular factual setting to which it is applied." The Court in *Waffle House* found a franchise agreement more analogous to a contract of employment than a contract for the sale of a business because of the substantially superior bargaining power of the franchisor.

In *National Teen-Ager*, supra at 469, the Court, citing *Waffle House*, held that whether a given covenant falls into the prohibited "in any capacity" category generally is not determinable solely from the face of the contract but must be determined based upon "the particular factual setting to which it is applied."

*Appeal*

Roberts' central argument is that paragraph 19 of the parties' agreement should be classified as a restrictive covenant ancillary to an employment agreement and, so categorized, is overly broad and thus unenforceable.

Given the fact that Roberts' bargaining power was equal to that of the parties with whom he contracted, the agreements they executed are more analogous to those involving the dissolution of a medical

partnership, such as *Rash*. We discern no material difference between a prohibition against engaging in the practice of medicine which, as previously stated, has been held to be generally enforceable in other cases, and the prohibition in this case that the physician will not "maintain a practice for the provision of medical services." We construe this to mean that Roberts is prohibited from maintaining a "medical practice."

The validity of the prohibition against Roberts' "enter[ing] the employ of any person or firm maintaining a practice for the provision of medical services" must be determined by the particular factual setting to which it is applied, as held in *Waffle House* and *National Teen-Ager*. Under the facts adduced at the interlocutory hearing, we cannot say that this prohibition is being applied unreasonably here. Consequently, we need not decide whether it can or should be severed.

*Judgment affirmed. Birdsong, P. J., and Andrews, J., concur.*

DECIDED NOVEMBER 18, 1992 —
RECONSIDERATION DENIED DECEMBER 4, 1992

*Sims, Fleming & Swan, John S. Sims, Jr.*, for appellant.
*Reinhardt, Whitley & Wilmot, Bob Reinhardt*, for appellees.