**FIFTH DIVISION**
**RICKMAN, C. J.,**
**MCFADDEN, P. J., and SENIOR APPELLATE JUDGE PHIPPS**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

***DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.***

**December 29, 2021**

# In the Court of Appeals of Georgia

A21A1644. AMERICAN ANESTHESIOLOGY OF GEORGIA,
LLC v. NORTHSIDE HOSPITAL, INC.

PHIPPS, Senior Appellate Judge.

In this action for a declaratory judgment concerning the enforceability of restrictive covenants, defendant American Anesthesiology of Georgia, LLC ("AAG") appeals from the trial court's order granting the plaintiff's motion for a judgment on the pleadings as to Counts One and Two of its complaint.[1] AAG contends that the trial court erred when it ruled that the restrictive covenants at issue here are unenforceable. For the reasons that follow, we agree and reverse.

---

[1] Although the trial court's order addressed only Counts One and Two of the plaintiff's three-count complaint, the court expressly directed the entry of a final judgment and determined that there is no just reason for delay as to its rulings on Counts One and Two. See OCGA § 9-11-54 (b).

AAG is the successor-in-interest to Gwinnett Anesthesia Services, P.C., while plaintiff Northside Hospital, Inc. d/b/a Northside Hospital Gwinnett and Northside Hospital Duluth is the successor-in-interest to Gwinnett Hospital System, Inc. For purposes of this appeal, AAG and its predecessors will be referred to collectively as "AAG," and Northside Hospital and its predecessors will be referred to collectively as "Northside."

At issue in this appeal is a 2003 "Professional Services Agreement for Anesthesia and Pain Management Services" (the "Services Agreement" or "Agreement") entered into between AAG and Northside. Under the Services Agreement, AAG agreed to provide Northside with the services of anesthesiologists (designated as "Specialists" in the Agreement) and physician assistants, certified registered nurse anesthetists, and other advanced practice nurses and nurse clinicians engaged in the specialty of anesthesiology (collectively designated as "Physician Extenders" in the Agreement) during the initial term and any renewal term of the Agreement. In return, Northside agreed to grant AAG the exclusive right to perform the services rendered by the Specialists and Physician Extenders for Northside's patients while the Agreement remained in effect.

By its express terms, the Services Agreement did not establish an employer-employee relationship between Northside (defined in the Agreement as the "System") and either AAG (defined as the "Practice") or its Specialists or Physician Extenders. In that regard, the Services Agreement states:

> The relation of the Practice, the Specialists, and the Physician Extenders with the System shall be that of independent contractors practicing their respective professions as medical specialists, and the Practice, the Specialists, and the Physician Extenders will at all times be considered independent contractors and not employees, agents or partners of the System.

The Services Agreement provisions primarily at issue in this appeal appear in Sections 9 (a) ("Offers by the Practice"), 9 (b) ("Offers by the System"), and 15 (c) ("Non-competition and Non-solicitation Covenants"). Section 9 (b) — the enforceability of which is at issue here — provides, in relevant part:

> Recognizing the special nature of the relationship existing, or that will exist, between the Practice and the Specialists and Physician Extenders whom it employs or retains in the Practice, and that the recruiting and training of Specialists and Physician Extenders by the Practice is a costly and time consuming endeavor, the System agrees that it will not, without the written consent of the Practice, [while the Agreement is in effect and for one year after its termination], directly or indirectly, through any manner or means, impair or initiate any attempt to impair

3

the relationship which exists between the Practice and any Specialists or Physician Extenders through offers of employment or offers of contracts for services to be rendered by such Specialists or Physician Extenders or otherwise.

The parties refer to the above provision as the "no-impairment clause." Section 9 (b) further provides that, while the Agreement is in effect and for one year after its termination, Northside "will not employ or contract with or otherwise permit any Physician Extender to provide services at the Hospitals[2] without the prior written consent of the Practice." The parties refer to this provision as the "no-hire clause."

Section 9 (a) similarly provides, in relevant part:

Recognizing the special nature of the relationship existing, or that will exist, between the System and the Department Personnel whom it employs or retains in the Department,[3] and that the recruiting and training of Department Personnel for the Department by the System is a costly and time consuming endeavor, the Practice agrees that it will not, without the written consent of the Hospital, [while the Agreement

---

[2] The Services Agreement defines "Hospitals" as several specifically identified medical facilities "and any other facility which is now or in the future may be owned or operated by [Northside], or any affiliate thereof."

[3] In relevant part, the Services Agreement defines (i) "Department" as "the Anesthesia Department and Pain Management Service of [Northside]"; and (ii) "Department Personnel" as "the non-physician . . . personnel employed by [Northside] and assigned to perform services or functions for the Department."

4

is in effect and for one year after its termination], directly or indirectly, through any manner or means, impair or initiate any attempt to impair the relationship which exists between the System and any Department Personnel through offers of employment or offers of contracts for services to be rendered by such Department Personnel or otherwise.

A related provision, Section 15 (c), in turn, provides:

*Non-competition and Non-solicitation Covenants*. The Practice covenants and agrees that [while the Agreement is in effect and for one year after its termination] by the System with cause or by the Practice without cause, the Practice shall not, on its own behalf or on behalf of any person[ or entity] ("Person"):

> (i) engage in the practice of professional anesthesiology services within the Service Area [defined as "Gwinnett County, Georgia"] (except with respect to those obligations to which the System has expressly consented in writing . . .). The Practice acknowledges and agrees that: (A) this covenant is intended to protect the investment the System has made and will continue to make in establishing the Department, the role of the Practice and the Specialists in the Department[ and] the System, and (B) the restrictions contained herein are reasonable in terms of duration, scope and geographic area; [or]

> (ii) solicit, recruit, or induce any employee or independent contractor of the System who is actively employed or otherwise engaged by [the] System and who was employed by or otherwise

5

engaged by [the] System at any time during the initial term or any renewal term of this Agreement to sever his or her relationship with [the] System or to be employed or otherwise engaged in any capacity by any other Person conducting a business of practicing medicine.

By its terms, the Services Agreement automatically renewed each year until AAG's parent company gave notice in August 2020 that it intended to terminate the Agreement on December 4, 2020. In November 2020, Northside filed this action seeking a judgment declaring that the no-impairment and no-hire clauses in the Services Agreement are unenforceable and therefore do not bar Northside from seeking to employ medical providers who have rendered services to Northside (through AAG) under the Agreement. Northside attached a copy of the Agreement to its complaint.

The case proceeded to a bifurcated bench trial, in which the parties first addressed Counts One and Two of Northside's complaint, which challenged the enforceability of the no-impairment and no-hire clauses, respectively. After Northside rested on Counts One and Two, it moved for a judgment on the pleadings as to those

counts.[4] In its order granting Northside's motion, the trial court first concluded that it was required to apply "strict scrutiny" to the no-impairment and no-hire clauses.[5] The court further determined that the no-hire clause is unenforceable because it bars Northside from even unsolicited contact with AAG personnel. On that basis, the court ruled that the no-impairment clause likewise is unenforceable. Finally, the court concluded that both covenants failed even if they were subject only to "mid-level scrutiny." This appeal followed.

We review de novo a trial court's ruling on a motion for a judgment on the pleadings, accepting all well-pled material allegations of the opposing party's pleading as true, and taking all allegations of the moving party which have been denied as false. See *Polo Golf & Country Club Homeowners Assn. v. Cunard*, 306 Ga. 788, 791-792 (2) (833 SE2d 505) (2019). A judgment on the pleadings should be granted "only where there is a complete failure to state a cause of action or defense." *Pressley v. Maxwell*, 242 Ga. 360, 360 (249 SE2d 49) (1978). "[I]n considering a motion for judgment on the pleadings, a trial court may consider exhibits attached to

_____

[4] It is unclear on the current record why Northside did not seek a judgment on the pleadings before trial. AAG also made an oral motion to dismiss Counts One and Two, which the trial court denied.

[5] The concept of "scrutiny" in this context is addressed later in this opinion.

and incorporated into the pleadings, including exhibits attached to the complaint or the answer." *BCM Constr. Group v. Williams*, 353 Ga. App. 811, 812 (840 SE2d 51) (2020) (citation and punctuation omitted).

The enforceability of a restrictive covenant is a question of law that we also review de novo, *Holland Ins. Group v. Senior Life Ins. Co.*, 329 Ga. App. 834, 837 (1) (766 SE2d 187) (2014), "looking solely to the language of the restrictive covenant." *Uni-Worth Enterprises v. Wilson*, 244 Ga. 636, 641 (2) (261 SE2d 572) (1979). We review the enforceability of restrictive covenants entered into before May 11, 2011 (as is the case here), based on the law as it stood at that time, before the enactment of Georgia's Restrictive Covenants Act, OCGA § 13-8-50 et seq. *Burson v. Milton Hall Surgical Assoc.*, 343 Ga. App. 159, 160-161 (806 SE2d 239) (2017); see Ga. L. 2011, pp. 399, 409 § 5. Before that date, Georgia law disfavored restrictive covenants, and the Georgia Constitution forbade the General Assembly from authorizing them. *Burson*, 343 Ga. App. at 161; see also *Rash v. Toccoa Clinic Med. Assoc.*, 253 Ga. 322, 323 (1) (320 SE2d 170) (1984) (observing, under the former law, that contracts in general restraint of trade are unenforceable as contrary to public policy).

Nevertheless, while a restrictive covenant may be unenforceable as an impermissible restraint on trade, it will be upheld "if the restraint imposed is not unreasonable, is founded on a valuable consideration, . . . is reasonably necessary to protect the interest of the party in whose favor it is imposed, and does not unduly prejudice the interests of the public." *West Coast Cambridge v. Rice*, 262 Ga. App. 106, 108 (1) (584 SE2d 696) (2003) (citation and punctuation omitted); accord *Habif, Arogeti & Wynne, P.C. v. Baggett*, 231 Ga. App. 289, 292 (2) (498 SE2d 346) (1998) (a restrictive covenant in an employment contract, such as a non-solicit or non-compete covenant, "is considered in partial restraint of trade and will be enforced if reasonable"). To determine whether a restraint affecting employment is reasonable, a court must consider "the nature and extent of the trade or business, the situation of the parties, and all the other circumstances. A three-element test of duration, territorial coverage, and scope of activity has evolved as a helpful tool in examining the reasonableness of the particular factual setting to which it is applied." *Habif, Arogeti & Wynne*, 231 Ga. App. at 292 (2) (citation and punctuation omitted).

In assessing reasonableness, Georgia courts apply three levels of scrutiny to restrictive covenants: (i) covenants ancillary to employment contracts receive strict scrutiny; (ii) covenants found in professional partnership agreements receive a middle

9

level of scrutiny; and (iii) covenants ancillary to the sale of a business receive much less scrutiny. *Swartz Investments v. Vion Pharmaceuticals*, 252 Ga. App. 365, 368 (2) (556 SE2d 460) (2001); accord *West Coast Cambridge*, 262 Ga. App. at 108 (1). Not every contract, however, neatly fits into one of these three categories. *Swartz Investments*, 252 Ga. App. at 368 (2). And the type of contract does not automatically determine the level of scrutiny. Id.

> Rather, we must look to the purposes behind the varying levels of scrutiny to determine which level is most appropriate for the contract before us. One starting point is the relative bargaining power of the parties: [t]he rationale behind the distinction in analyzing covenants not to compete is that a contract of employment inherently involves parties of unequal bargaining power to the extent that the result is often a contract of adhesion. On the other hand, a contract for the sale of a business interest is far more likely to be one entered into by parties on equal footing. The unequal bargaining power in the employment context is one reason covenants in employment agreements are given increased scrutiny.

Id. at 368-369 (2) (citations and punctuation omitted); see also *Rash*, 253 Ga. at 325 (2) (while an employee enters into an employment agreement "at a great bargaining disadvantage," that "would not be expected to be the case in a professional partnership arrangement").

Another relevant factor is "whether there is independent consideration for the restrictive covenant itself." *Swartz Investments*, 252 Ga. App. at 369 (2). In that regard, in an employment agreement,

> an employee generally receives no consideration separate from his employment for a restrictive covenant . . . . On the other hand, in a partnership agreement a partner has not only restricted himself, but he has also exacted from each of the other contracting parties a like restriction. The lack of consideration for an employee's restrictive covenant is an additional justification for subjecting employment agreements to heightened scrutiny.

Id. (citation and punctuation omitted); accord *Rash*, 253 Ga. at 325-326 (2).

Thus, even where a contract is denominated an "employment contract," it may be treated as a partnership agreement for purposes of determining the level of scrutiny to be applied where the parties have relatively equal bargaining power and extract similar, mutual restrictions from each other, with attendant mutual advantages. See *Pittman v. Harbin Clinic Professional Assn.*, 210 Ga. App. 767, 769-770 (1) (437 SE2d 619) (1993). And where these factors are present, they "weigh in favor of the enforceability of restrictive covenants." *Physician Specialists in Anesthesia, P.C. v. MacNeill*, 246 Ga. App. 398, 402 (2) (a) (539 SE2d 216) (2000). With this background, we turn to AAG's claims on appeal.

11

1. AAG first challenges the trial court's determination that strict scrutiny applies here. The trial court based its ruling in this regard entirely on the fact that the Services Agreement designates AAG as an "independent contractor" of Northside and therefore must be treated as an employment agreement. The decisions on which the trial court relied, however, do not support its conclusion on this issue.

The first case cited by the trial court — *Paragon Technologies v. InfoSmart Technologies*, 312 Ga. App. 465 (718 SE2d 357) (2011) — involved an "independent contractor agreement" pursuant to which InfoSmart provided staffing to a Paragon client. Id. at 465-466. The agreement at issue included a restrictive covenant that barred InfoSmart from interfering with Paragon's relationship with its client and from accepting an offer to provide services directly to the client during the term of the agreement and for one year thereafter. Id. at 466. When InfoSmart began providing services directly to Paragon's client, litigation ensued, and Paragon sought to enforce the restrictive covenant. See id. In affirming the grant of summary judgment in favor of InfoSmart, this Court concluded that: (i) the restrictive covenant was subject to strict scrutiny because it "was included in an independent contractor agreement," which generally is treated like an employment contract for such purposes; and (ii) the covenant was unenforceable because it "precluded InfoSmart from accepting

12

unsolicited work from Paragon's former client." Id. at 467. Importantly, this Court highlighted that the application of strict scrutiny also was supported by "[a] lack of evidence showing any consideration for the restrictive covenant, as well as the one-sided nature of the contract," which gave Paragon ownership of all intellectual property created under the agreement, included indemnity and hold harmless provisions in Paragon's favor, and appeared to have been drafted by Paragon. See id. at 466, 467, n. 1.

Contrary to the trial court's ruling here, *Paragon Technologies* does not stand for the proposition that the designation of an agreement as an "independent contractor agreement" — without more — automatically requires the application of strict scrutiny. Rather, the decision in *Paragon Technologies* must be read as limited by its facts, under which multiple factors supported the application of strict scrutiny. See 312 Ga. App. at 466-467 & n. 1; see also *Cline Drive Land Trust v. Wells Fargo Bank, N. A.*, 339 Ga. App. 342, 345 (793 SE2d 550) (2016) ("A decision's holding is limited to the factual context of the case being decided and the issues that context necessarily raises. Language that sounds like a holding — but actually exceeds the scope of the case's factual context — is not a holding no matter how much it sounds like one.") (citation and punctuation omitted). Our conclusion in that regard is in

accord with the proposition that it is the substance of a contract and the parties' relationships — rather than any names given to them — that determine the level of scrutiny to be applied. See *Pittman*, 210 Ga. App. at 769-770 (1).

The second case cited by the trial court in support of its application of strict scrutiny — *Jenkins v. Jenkins Irrigation*, 244 Ga. 95 (259 SE2d 47) (1979) — involved neither an employment contract nor an independent contractor agreement, but rather addressed a covenant not to compete in the sale of business assets, and thus has no application here. Id. at 99 (2).

The last case cited by the trial court — *Anesthesia Healthcare Partners v. Anesthesia Healthcare Solutions of North Florida*, No. 3:11cv149/MCR/EMT, 2012 WL 13024036 (N.D. Fla. Sept. 19, 2012) ("*AHP*") — also does not support the court's ruling that strict scrutiny applies here, for two reasons. First, after finding that the case before it involved an independent contractor agreement, the federal district court in *AHP* summarily concluded that strict scrutiny applied solely in reliance on *Paragon Technologies*, 312 Ga. App. 465. *AHP*, 2012 WL 13024036 at *4 (B) (1). As stated above, however, the holding in *Paragon Technologies* does not reach that far. Second, the *AHP* court also found that the covenant not to compete at issue in that case was unenforceable because, among other reasons, it conferred no benefit on the

14

party seeking to enforce the covenant. 2012 WL 13024036 at *6. Here, however, the Agreement explicitly identifies the benefits each party seeks to protect via the mutual covenants: protection of the "special . . . relationship[s]" each party has with its own personnel, the "recruiting and training" of whom are "costly and time consuming endeavor[s]."

As discussed above, the level of scrutiny to be applied does not "automatically" depend on the "type of contract," but rather depends on the "purposes behind the varying levels of scrutiny." *Swartz Investments*, 252 Ga. App. at 368-369 (2). And two starting points for making that determination are "the relative bargaining power of the parties" and "whether there is independent consideration for the restrictive covenant itself." Id. at 369 (2). Here, both factors weigh in favor of treating the Agreement as a partnership agreement and applying mid-level scrutiny.

First, Northside points to nothing in the record suggesting that it and AAG did not possess relatively equal bargaining power when each business entity, represented by counsel, entered into the Agreement. In fact, the plain text of the Agreement — which extracts mutual considerations from each party — is indicative of equal bargaining power. In addition, the face of the Agreement contains no indication that it was drafted primarily by either party, and neither party suggests that was the case.

15

Second, the existence of mutual concessions also establishes independent consideration for the restrictive covenants: in return for Northside's agreement not to poach AAG personnel for one year after termination of the Agreement, AAG agreed not to poach Northside personnel or engage in the practice of anesthesiology in Gwinnett County during that time.[6] See *Celtic Maintenance Svcs. v. Garrett Aviation Svcs.*, No. CV 106-177, 2007 WL 4557775, at *3 (II) (S.D. Ga. Dec. 21, 2007) (concluding that a non-recruitment provision in a maintenance service agreement was subject only to intermediate scrutiny because there was no issue of unequal bargaining power, and the agreement "bound *both* [parties] not to pirate each other's employees"); see also generally *Dougherty, McKinnon & Luby, P.C. v. Greenwald, Denzik & Davis, P.C.*, 213 Ga. App. 891, 894 (2) (a) (447 SE2d 94) (1994) (recognizing that a business has a "legitimate need to protect itself from the risk" that a former employee may take advantage of confidences and rapport with

---

[6] Northside's passing, conclusory assertion that there is no independent consideration for the no-hire clause because only the no-impairment clause applies to both parties splits one hair too many. While each clause is directed toward slightly different conduct, both, at their core, prohibit employee-poaching for the same period of time and apply equally to both parties. Regardless, any potential imbalance (in AAG's favor) between Section 9 (a) and Section 9 (b) in that regard is re-balanced by Section 15 (c), which bars AAG from practicing anesthesiology in Gwinnett County and inducing any Northside personnel to leave Northside to practice medicine elsewhere for one year following the termination of the Agreement.

16

clients obtained during his employment "to appropriate or 'pirate' such clients for [his] own benefit").

In light of the above, neither party here bears any resemblance to an individual independent contractor with no bargaining power subject to an employment agreement in which the only benefit to the individual is a job. See *Rash*, 253 Ga. at 325-326 (2); id. at 326 (2) ("[I]nequality of bargaining power is a determining factor in judging the reasonableness of a restrictive covenant . . . ."); *Swartz Investments*, 252 Ga. App. at 368-369 (2); *Celtic Maintenance Svcs.*, 2007 WL 4557775, at *3 (II). Consequently, the Agreement's designation of AAG as an "independent contractor[]" weighs little in our analysis. Moreover, given the parties' relatively equal bargaining positions and the mutual considerations in the Agreement — including the mutual and independent considerations with respect to the restrictive covenants — we hold that the Agreement is more akin to a partnership agreement than an employment contract, thereby subjecting its restrictive covenants to mid-level scrutiny. See *Rash*, 253 Ga. at 325-326 (2); *Swartz Investments*, 252 Ga. App. at 368 (2); accord *Habif, Arogeti & Wynne*, 231 Ga. App. at 290-291 (1) (applying mid-level scrutiny to an employment agreement of an accountant who "was in a bargaining position equivalent to that of" his former employer, where all parties to the agreement were

17

subject to "identical restrictive covenants"); *Pittman*, 210 Ga. App. at 769-770 (1) (concluding that the employment contracts at issue were "more usefully viewed as . . . partnership agreements," given the parties' equal bargaining power and the fact that the agreements extracted mutual restrictions on all parties, with attendant mutual benefits); *Roberts v. Tifton Med. Clinic, P.C.*, 206 Ga. App. 612, 612-613, 616-617 (426 SE2d 188) (1992) (holding that an employment agreement executed by a clinic's physician-shareholder was more analogous to a partnership agreement, and upholding a restrictive covenant in that agreement barring the physician from practicing medicine within twenty-five miles of a clinic facility for two years after termination of employment); *Celtic Maintenance Svcs.*, 2007 WL 4557775, at *3 (II). The trial court therefore erred when it applied strict scrutiny here.

2. AAG next challenges the trial court's conclusion that the no-hire clause is unenforceable. The trial court concluded that this provision is invalid for the sole reason that "it bars [Northside] from even unsolicited contact with AAG's employees." We conclude that the trial also erred in this ruling.

(a) Applying mid-level scrutiny, in a whole-court decision, we upheld the validity of a restrictive covenant barring a former shareholder and officer in an accounting firm from rendering accounting services in a seven-county area for a

18

period of two years following his departure from the firm. See *Habif, Arogeti &amp; Wynne*, 231 Ga. App. at 291-297 (2). Critically, in that decision, we expressly rejected the former shareholder's claim that the covenant was unreasonable because it barred him from accepting unsolicited business. Id. at 295-297 (2) (c).

Similarly, and also applying mid-level scrutiny, the Supreme Court of Georgia upheld the validity of a restrictive covenant barring a party from practicing medicine within twenty-five miles of a city, for a period of three years after termination of his employment. See *Rash*, 253 Ga. at 322-323, 325-326 (2). This Court likewise found that a restrictive covenant that barred a physician from practicing medicine within twenty-five miles of a facility operated by his former employer, for two years after termination of his employment, was enforceable under mid-level scrutiny. See *Roberts*, 206 Ga. App. at 612-613, 616-617. And in *Pittman*, 210 Ga. App. at 769-770 (1), we upheld a covenant barring two physicians from practicing medicine within a thirty-mile radius of a clinic in Rome, for a period of one year after leaving employment at the clinic, also applying mid-level scrutiny.[7] Notably, each of these

[7] Although our decision in *Pittman* did not explicitly identify the scrutiny we applied as "mid-level," we implicitly did so when we recognized that: (i) the employment contracts at issue were more properly viewed as partnership agreements; and (ii) consideration of the differences between professional partnership agreements and employment contracts "weighs in favor of the enforceability of restrictive

19

decisions upheld broad bans on "practicing medicine," without regard to whether any potential future patients covered by the bans unilaterally sought out medical care without prior solicitation by the physicians.[8]

Nevertheless, in *Carson v. Obor Holding Co.*, 318 Ga. App. 645 (734 SE2d 477) (2012), this Court found that a restrictive covenant barring a former employee from accepting business from any of his former employee's clients was unenforceable even under mid-level scrutiny because: (i) "it contain[ed] no territorial restriction, a fatal flaw"; and (ii) the prohibition on accepting *unsolicited* business "violates

covenants in the former, and against their enforceability in the latter." 210 Ga. App. at 769 (1).

[8] In *Delli-Gatti v. Mansfield*, 223 Ga. App. 76, 77-81 (1)-(3) (477 SE2d 134) (1996), we similarly upheld a covenant barring a physician from providing medical care within a single county for one year following the termination of a medical services agreement. Our decision in *Delli-Gatti* did not explicitly identify the level of scrutiny applied, although we highlighted that the employment contract at issue included a "future option to form a partnership." 223 Ga. App. at 77 (1). And in *McAlpin v. Coweta Fayette Surgical Assoc. P.C.*, 217 Ga. App. 669, 670, 673 (2) (458 SE2d 499) (1995), we upheld a covenant barring a physician from "engag[ing] in the practice of medicine" within a ten-county area for a period of two years following the termination of his employment contract, which contemplated a future partnership. (Punctuation omitted.) While we also did not explicitly identify the level of scrutiny applied in *McAlpin*, we highlighted the "distinction between consideration of restrictive covenants in employer/employee situations as opposed to a partnership situation, with the former requiring a stricter scrutiny in determining the reasonableness of the restrictions." 217 Ga. App. at 672 (2).

20

Georgia public policy because it unreasonably impacts the restricted party's ability to make a living and the public's ability to choose the business or professional it prefers to contract with." Id. at 650-651 (1) (b) (citation and punctuation omitted). When viewed in context with the decisions in *Rash*, 253 Ga. 322, *Habif, Arogeti & Wynne*, 231 Ga. App. 289, *Pittman*, 210 Ga. App. 767, and *Roberts*, 206 Ga. App. 612, we read the holding in *Carson* as limited to its specific factual context. See *Cline Drive Land Trust*, 339 Ga. App. at 345. And so viewed, the ruling in *Carson* that prohibitions on unsolicited conduct do not survive mid-level scrutiny must be read in conjunction with the *absence of territorial limits* in that case and in the context of accepting unsolicited business from a former employer's *clients*. Accord *OnBrand Media v. Codex Consulting*, 301 Ga. App. 141, 146 (2) (a) (ii) (687 SE2d 168) (2009) (holding that, under mid-level scrutiny, a covenant not to compete was unenforceable because it contained "no specific territorial limits [or] any clear limits on the scope of the prohibited activity").

Unlike in *Carson*, the covenants at issue here address *employee*-poaching, and not client- or business-poaching. This distinction is critical. Territorial limits necessarily play a role in balancing the interests of an employer in protecting the

21

territory in which it conducts business against a former employee's interests in being able to support herself. That is because

> [t]he goal of a non-competition covenant is to balance two competing rights: first, the employee's right to earn a living and his ability to determine with certainty the prohibited territory; second, the employer's interest in customer relationships created or furthered by its former employee on its behalf and its right to protect itself from the former employee's possible unfair appropriation of contacts developed while working for the employer. Under this analysis, an employer is permitted to include in such a covenant the territory in which the employee has in fact performed work.

*Habif, Arogeti & Wynne*, 231 Ga. App. at 292-293 (2) (b) (citation and punctuation omitted).

In the context of employee-poaching, however, it matters not whether one's employee is hired away to work across the street or across the globe — the harm to the employer is the same in either case, as is implicitly recognized in the Agreement provisions to the effect that recruiting and training of each party's personnel "is a costly and time consuming endeavor." See *Harrison v. Sarah Coventry, Inc.*, 228 Ga. 169, 170-172 (1) (184 SE2d 448) (1971) (upholding a covenant barring the appellants from "solicit[ing] or in any manner attempt[ing] to induce [their former employer]'s

salespeople or employees to leave the company," even absent a territorial limitation) (punctuation omitted); *Sanford v. RDA Consultants*, 244 Ga. App. 308, 309, 311 (2) (535 SE2d 321) (2000) (upholding a covenant barring the appellant from "attempt[ing] to employ or assist any other person in employing or soliciting for employment" any of his prior employer's employees for one year after his employment ended, despite the absence of a territorial limitation); *Celtic Maintenance Svcs.*, 2007 WL 4557775, at *4-5 (II) (concluding that an agreement between two entities not to poach each other's employees was enforceable under Georgia law, despite the absence of a territorial limitation); see also *Chaichimansour v. Pets Are People Too, No. 2*, 226 Ga. App. 69, 71 (1) (485 SE2d 248) (1997) (observing that "if the scope of prohibited behavior is narrow enough . . . , the covenant may be reasonable even if it has no territorial limitation"); see also generally *Habif, Arogeti & Wynne*, 231 Ga. App. at 295 (2) (c) (recognizing that "[a] covenant not to compete . . . is designed primarily to protect the employer's investment of time and money in developing the employee's skills"). This distinction is even more critical given the facts of this case, which does not involve an employer and employee, but rather concerns two employers who have mutually agreed not to "pirate" each other's personnel for a limited period of time. For this reason, a territorial limit would be

23

largely (if not entirely) superfluous, as the very nature of the covenants at issue here — which bar only the two parties to the Services Agreement from hiring only each other's personnel — is necessarily narrowly limited in a manner that would be largely analogous to a territorial limitation.[9] Consequently, territorial limits play no role in our analysis on the particular facts presented here, and the decision in *Carson* does not control the outcome of this case.[10]

Notably, neither party has cited, and research has not revealed, any Georgia appellate decisions other than *Carson* in which bans on unsolicited contact were determinative under mid-level scrutiny.[11] And for the reasons stated above, when

[9] Regardless, the covenants here necessarily (although implicitly) are territorially limited. Given that Northside operates only in Gwinnett County , the covenants at issue here — which prohibit AAG from operating in Gwinnett County within one year of the Agreement's expiration — bar Northside from hiring AAG personnel only in Gwinnett County and similarly bar AAG from poaching Northside employees only out of Gwinnett County.

[10] As a result, Northside's passing, conclusory suggestion that the territory here is insufficiently limited because Northside potentially could acquire or "expand to new," unidentified "locations" (presumably outside of Gwinnett County) at some unidentified point in the future — which assumes what it seeks to establish — is irrelevant to our analysis.

[11] Each of the decisions on which the trial court relied in concluding that the ban on unsolicited contact renders the covenants here unenforceable applied strict scrutiny and thus do not apply here, for the reasons stated in Division 1, above. See *Burson*, 343 Ga. App. at 165 (1) (b); *Paragon Technologies*, 312 Ga. App. at 467;

24

*Carson* is properly read in the context of its facts and in conjunction with the decisions in *Rash*, 253 Ga. 322, *Habif, Arogeti & Wynne*, 231 Ga. App. 289, *Pittman*, 210 Ga. App. 767, and *Roberts*, 206 Ga. App. 612, the decision in *Carson* does not support the trial court's ruling here that the bans on unsolicited contact with each party's former employees, standing alone, render the covenants unenforceable under mid-level scrutiny. Given the particular interests at issue in the employee-poaching context presented in this case, we hold that the ban on unsolicited contact does not render the no-hire clause unenforceable under mid-level scrutiny.[12] See *Rash*, 253 Ga.

*Cox v. Altus Healthcare & Hospice*, 308 Ga. App. 28, 31 (2) (a) (706 SE2d 660) (2011). While *American Gen. Life & Acc. Ins. Co. v. Fisher*, 208 Ga. App. 282 (430 SE2d 166) (1993) (physical precedent only), also cited by the trial court, did not explicitly refer to the level of scrutiny applied, it implicitly applied strict scrutiny when it held that the invalidity of one non-competition clause rendered the whole agreement invalid. Id. at 284 (2); see also *Swartz Investments*, 252 Ga. App. at 368 (2) (covenants subject to strict scrutiny cannot be "blue-penciled").

[12] On a related note, the covenants at issue here are more properly viewed as analogous to covenants not to compete — "which [are] designed primarily to protect the employer's investment of time and money in developing the employee's skills" — rather than covenants not to solicit — "which [are] designed primarily to protect the employer's investment of time and money in developing customer relationships." See *Habif, Arogeti & Wynne*, 231 Ga. App. at 295 (2) (c) (citation and punctuation omitted). And a covenant not to compete "may preclude the employee from accepting related business (whether solicited or not) from any clients (whether previously contacted by him or not) if the employee is officed in, or is to perform the restricted activities in, the forbidden territory." Id.; accord *Chaichimansour*, 226 Ga. App. at 70-72 (holding valid a covenant not to compete barring an employee from working

25

at 322-323, 325-326 (2); *Habif, Arogeti & Wynne*, 231 Ga. App. at 291-297 (2);

*Pittman*, 210 Ga. App. at 769-770 (1); *Roberts*, 206 Ga. App. at 612-613, 616-617.

(b) It appears that the trial court found no need to engage in further analysis in light of its conclusion that bans on unsolicited contact (under the "scope of activity" prong of the three-part test identified in *Habif, Arogeti & Wynne*, 231 Ga. App. at 292 (2)) disposed of the enforceability of the no-hire clause. Aside from the bans on unsolicited contact, the trial court did not find any further problems with the scope of prohibited conduct, and Northside identifies no other issues concerning the scope of prohibited conduct in the covenants at issue here. Because the material facts are undisputed, and in the interest of judicial economy, we exercise our discretion to decide the remaining issues, rather than directing the trial court to address them in the first instance on remand. See *J. M. High Co. v. Arrington*, 45 Ga. App. 392, 392 (3) (165 SE 151) (1932) (where the material facts are undisputed and the issue on appeal is a question of law, "it is unnecessary to send the case back for another hearing in the trial court"); accord *Ingraham v. Marr*, 246 Ga. App. 445, 447 (2) (540 SE2d 652) (2000).

---

as a veterinarian in a limited territory, even though the covenant necessarily prevented the employee from accepting unsolicited business).

As we have already determined that territorial limits play no role in our analysis on the particular facts of this case, we are left only to address whether the duration of the covenants is reasonable. As discussed above, both the Supreme Court and this Court have approved of two- and three-year prohibitions on practicing medicine. See *Rash*, 253 Ga. at 322-323, 325-326 (2); *Habif, Arogeti & Wynne*, 231 Ga. App. at 292 (2) (a); *Roberts*, 206 Ga. App. at 612-613, 616-617. And neither party has cited any authority indicating that these time limits would not be equally reasonable in the employee-poaching context. We therefore conclude that the one-year limitation at issue here is reasonable. See *Rash*, 253 Ga. at 322-323, 325-326 (2); *Habif, Arogeti & Wynne*, 231 Ga. App. at 292 (2) (a); *Roberts*, 206 Ga. App. at 612-613, 616-617.

(c) We now turn to Northside's contention that the no-hire clause is unenforceable because it does not protect a legitimate business interest of AAG. See *Habif, Arogeti & Wynne*, 231 Ga. App. at 294 (2) (c) ("The restricted activities must be reasonably related to the business interests the employer seeks to protect."). Northside's claim in this regard relies on the proposition that, because the Agreement prohibits AAG from engaging in the practice of anesthesiology in Gwinnett County for one year following the termination of the Agreement, AAG has no legitimate

27

interest in keeping its personnel from working in Gwinnett County during that time. Contrary to Northside's argument, however, the interest AAG seeks to protect concerns the considerable resources it has expended to recruit and train personnel that it does not want poached — by its very nature, that interest is not limited to Gwinnett County. And Northside's reliance on decisions in which enforcement of a covenant would benefit only one party also is misplaced, as the Agreement here equally benefits Northside by preventing AAG from poaching Northside employees during the same time period.

(d) Finally, Northside contends that the no-hire clause is unenforceable because it "unduly prejudices the interests of the public." In that regard, Northside maintains that "[t]he community" would suffer unidentified negative effects were Northside to lose all of its current anesthesiology staff. As observed by the Supreme Court, however, one community's temporary loss is another community's gain when medical professionals are subject to bargained-for contractual restrictions on practicing in a certain area. In that vein, the Court highlighted in *Rash*, 253 Ga. at 326 (3), that, while enforcing a covenant restricting medical professionals' ability to practice in one area would limit the right of potential patients in that area to avail themselves of the professionals' services, it also "would afford countless other people in other areas,

28

both in and outside of the state, the opportunity to have [such professionals] in their areas." On that basis, the Court found that there was no reason to conclude that the need for a certain professional's services in a certain area was "sufficient to outweigh the law's interest in upholding and protecting freedom to contract and to enforce contractual rights and obligations." Id. On a related note, "Georgia case law, as well as that of other jurisdictions, has established that covenants such as the ones in issue" — i.e., in medical professional partnership agreements — "do not conflict with medical ethical principles or Georgia law requiring informed consent or injure the public in general." *Pittman*, 210 Ga. App. at 770 (3).

To the extent that Northside contends that the particular factual context presented here weighs against enforcing the covenants — e.g., that Northside will be unable to replace its anesthesiology staff without hiring AAG employees, or that, for any other similar reason, Gwinnett County in particular will suffer undue harm by enforcement of the no-hire clause at this particular time — any such issues are not relevant to the trial court's ruling or our analysis in the context of a motion for a judgment on the pleadings, as our review is limited to the pleadings (and exhibits attached thereto) and the language of the restrictive covenants at issue. See *Uni-Worth Enterprises*, 244 Ga. at 641 (2); *BCM Constr. Group*, 353 Ga. App. at

812. And on a similar note, Northside's conclusory assertion that AAG's personnel will be "unable to make a living if AAG prevail[s]" also raises a factual issue that plays no role in our analysis on the current procedural posture.[13] See *Uni-Worth Enterprises*, 244 Ga. at 641 (2); *BCM Constr. Group*, 353 Ga. App. at 812. For each of the above reasons, the trial court erred when it concluded that the no-hire provision is unenforceable and granted a judgment on the pleadings to Northside on that basis.

---

[13] We take this opportunity to highlight that we are not asked here to address agreements between any individual practitioners, on the one hand, and Northside or AAG, on the other hand, and we express no opinion on the extent to which our analysis in this decision would be relevant to any such agreements. We likewise express no opinion on the potential merits of any challenge that an individual practitioner may raise to the Services Agreement. We rather address only the ability of AAG to enforce the Agreement *with respect to Northside* in this declaratory judgment proceeding. See *Celtic Maintenance Svcs.*, 2007 WL 4557775, at *4 (II) (highlighting that the purpose of the non-recruitment provision then at issue before the court "was not to foreclose [the plaintiff's] employees from competing or practicing their chosen trade or profession, but to prevent [the defendant] from poaching [the plaintiff]'s workers and thereby rendering [the plaintiff] an involuntary and unpaid employment agency") (citation and punctuation omitted). Moreover, because we are not tasked with addressing the interests of any individual practitioners, we also express no opinion on (a) what type of relief — if any — may be available to either party for any potential breach of the Agreement by the other or (b) the merits of any potential challenge that AAG or Northside *personnel* may have to the Agreement or to any agreement that individual practitioners may have with either party. Indeed, Northside itself urges us to "disregard . . . matters outside the pleadings."

3. Given our rulings in Division 2, the trial court necessarily erred when it found that the no-impairment clause may not be enforced based entirely on the court's finding that the no-hire clause is unenforceable. And Northside does not elaborate any arguments as to (a) how the no-impairment clause differs materially from the no-hire clause for purposes of the analysis in this decision or (b) why we should find the no-impairment clause unenforceable on its own terms.[14] We therefore reverse the trial court's ruling on this issue

as well, and remand this case to the trial court for further proceedings consistent with this opinion.

*Judgment reversed and case remanded. Rickman, C. J., and McFadden, P. J., concur.*

---

[14] Notably, as discussed above, while each clause is directed toward slightly different conduct, both, at their core, prohibit employee-poaching for the same period of time, and we see no reason why the no-impairment clause would not be subject to the same analysis as the no-hire clause. See note 6, above. Northside essentially concurs in this assessment by contending that "[t]he no-impairment provision operates the same as the no-hire provision; it would prohibit Northside from making any offers of employment or offers of contracts to AAG's employees, even if Northside did not recruit them" and that the "same rationale" applies to the question of whether each clause is enforceable. (Punctuation omitted.)